Table of Contents

PROXY STATEMENT

VOTING SECURITIES OF THE COMPANY

SUMMARY TERM SHEET

PROPOSAL NO. 1: AMENDMENT TO THE CERTIFICATE OF INCORPORATION

SPECIAL FACTORS

THE REVERSE SPLIT

SUMMARY FINANCIAL INFORMATION

PROPOSAL NO. 2: ELECTION OF DIRECTORS

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

EXECUTIVE COMPENSATION

REPORT OF COMPENSATION COMMITTEE

AUDIT COMMITTEE REPORT AND INDEPENDENT ACCOUNTANT

COMPARISON OF TOTAL STOCKHOLDER RETURN

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

OTHER MATTERS

APPENDIX A – Certificate of Amendment to Certificate of Incorporation

APPENDIX B – Proxy Card

**A copy of the Company's Annual Report on Form 10-K for the year ended December 31, 2004, as filed with the Securities and Exchange Commission (the "Commission"), will be sent without charge to any stockholder of record or beneficial owner of shares of the Company's Common Stock or Preferred Stock upon receipt of a written request addressed to: Douglas W. McMinn, President and Chief Executive Officer, Kaiser Group Holdings, Inc., 9300 Lee Highway, Fairfax, Virginia 22031. Provided with the copy of the Report will be a list of the exhibits to the Report filed with the Commission by the Company. Any such exhibits will be provided to any Company stockholder upon separate request.**

i

## PROXY STATEMENT

This Proxy Statement is furnished to stockholders of Kaiser Group Holdings, Inc. (the "Company" or "Kaiser Holdings") in connection with the solicitation of proxies for use at the 2005 Annual Meeting of Stockholders (the "Annual Meeting") to be held on [          ], [          ], 2005, at the time and place and for the purposes set forth in the accompanying Notice of Annual Meeting of Stockholders. The record date for determining stockholders entitled to vote at the Annual Meeting is the close of business on April 28, 2005 (the "Record Date").

A proxy card is included with this Proxy Statement and Annual Report mailing, and your proxy is solicited by the Board of Directors of the Company (the "Board of Directors" or the "Board"). If your shares are registered in your name, the proxy card shows the number of shares of Kaiser Group Holdings, Inc. Common Stock, par value $0.01 per share ("Common Stock"), and Preferred Stock, par value $0.01 per share ("Preferred Stock"), that you own as of the Record Date. As explained in the accompanying notice, you must mail your proxy card in sufficient time for it to be received by the Company's stock transfer agent before the close of business on [          ], [          ], 2005.

Please complete and sign the enclosed proxy card and return it to the Company as soon as possible. If you change your mind after you return your proxy card, you can revoke it at any time, including at the Annual Meeting. You may revoke your proxy by mailing a second (or subsequent) proxy card to the Company's stock transfer agent for receipt prior to the Annual Meeting, or by voting on the ballot provided to stockholders at the Annual Meeting. Unless a proxy is revoked, all proxy cards that are properly executed and received at or prior to the Annual Meeting will be voted in accordance with what is written on the cards. Unless a contrary instruction is indicated in the proxy card, or if the proxy card is properly executed but the voting "box" is left blank, it will be voted FOR the approval of the amendment to the Certificate of Incorporation to effectuate the reverse stock split and FOR the election of directors as nominated and in the discretion of the person(s) named as the proxy if any other business properly comes before the Annual Meeting.

The Annual Report of the Company for the year ended December 31, 2004 (including financial statements), the Notice of Annual Meeting, this Proxy Statement, and the enclosed proxy card initially were mailed in a single envelope to stockholders on or about [          ], 2005. The Company has borne the cost of preparing, assembling, and mailing these items. Directors, officers, and employees of the Company may solicit proxies on behalf of the Company by telephone and personal interview without special compensation.

The Company will deliver copies of the Annual Report and proxy material to brokerage firms and other custodians, nominees, and fiduciaries for forwarding to beneficial owners of the Company's Common Stock and Preferred Stock. The Company will reimburse those brokerage firms, custodians, nominees, and fiduciaries for their expenses in connection with forwarding these materials.

## VOTING SECURITIES OF THE COMPANY

The Company's Common Stock and Preferred Stock issued and outstanding as of the Record Date are entitled to vote at the Annual Meeting. There were 1,613,270 shares of Common Stock and [489,249] shares of Preferred Stock issued and outstanding as of the Record Date, net of 101,471 treasury shares. Each share of Common Stock is entitled to one vote per share. Holders of Preferred Stock are

1

generally entitled to vote with holders of Common Stock on all matters submitted to a vote of stockholders, including the election of directors, with each share of Preferred Stock being entitled to one-tenth of a vote.

The Bylaws of the Company provide that the holders of shares of stock with a majority of the voting power of the outstanding shares entitled to a vote at the meeting must be present in person or represented by proxy in order for a quorum to exist for the transaction of business at that meeting. Assuming that such a quorum is present for the Annual Meeting, a plurality of the votes cast at the meeting, in person or by proxy, will determine the election of the directors. To approve the proposal to amend the Certificate of Incorporation of the Company to effectuate a reverse stock split, the affirmative vote of the holders of a majority of the voting power of the Company's Common Stock and Preferred Stock is required. Abstentions and broker non-votes will be counted as present for the purpose of computing the quorum, but will not be counted as affirmative votes.

## FORWARD-LOOKING STATEMENTS

Certain statements in this Proxy Statement, including statements preceded by, or predicated upon the words "anticipates," "appears," "believes," "expects," "estimated," "hopes," "plans," "should," "would" or similar words constitute forward-looking statements. Such forward-looking statements involve known and unknown risks, uncertainties and other important factors that could cause the actual results, performance or achievements of the Company or industry results to differ materially from any future results, performance or achievements expressed or implied herein.

## SUMMARY TERM SHEET

The following paragraphs summarize the material terms and conditions of the reverse stock split. This summary should be read in conjunction with the full text of this Proxy Statement and the annexes attached hereto. EACH STOCKHOLDER IS URGED TO READ THE ENTIRE PROXY STATEMENT AND THE APPENDIX WITH CARE.

- *The Reverse Split (page 24)*

Upon approval of Proposal No. 1 by the stockholders of the Company, the Company will file with the Delaware Secretary of State the Certificate of Amendment, attached hereto as Appendix A , to the Company's Certificate of Incorporation (the "Amendment") to effectuate a one for 20 reverse split (the "Reverse Split") of the Company's Common Stock, $0.01 par value, as unanimously approved by the Company's Board of Directors.

Every holder of record on the date of the filing of the Amendment with the Delaware Secretary of State (the "Effective Date") will be entitled to receive one share of Common Stock for every 20 shares of Common Stock held by such person. No fractional shares will be issued in connection with the Reverse Split. Following the Reverse Split, the Company will pay holders of fractional shares an amount equal to $29.25 for each corresponding share of Common Stock (the "Cash Consideration") held by such stockholder immediately before the Effective Date. For detailed information concerning the terms and provisions of the Reverse Split, see "Special Factors" and "The Reverse Split."

2

Following the completion of the Reverse Split and the filing of a Form 15 with the Securities and Exchange Commission (the "Commission"), the Company's registration of its Common Stock and its duty to file reports with the Commission under Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended ("SEC Reporting Obligations"), will cease, and the Company will no longer be a reporting company. The Company will continue operations as a non-reporting corporation. For detailed information concerning the purpose, reasons for and effect of the Reverse Split, see "Special Factors."

- *Special Committee Recommendation (page 6)*

The Company appointed a special committee comprised of one independent director, Frank E. Williams, Jr. (the "Special Committee"), to consider the proposed Reverse Split and the per share Cash Consideration to be paid to stockholders who would otherwise receive less than one share of Common Stock in the Reverse Split, and make a recommendation to the entire Board of Directors regarding the per share consideration to be paid in connection with the Reverse Split. Mr. Williams was selected to serve in this role since he is the only director who is neither related to a major stockholder nor a member of management.

The Special Committee consulted with management and a consultant, KAS Consulting and its principal, Kenneth A. Schweers, regarding the factors to be considered in determining the appropriate price per share to be paid in the Reverse Split. After such consultations, the Special Committee determined that the Cash Consideration of $29.25 per share was fair, from a financial point of view, to those stockholders receiving the Cash Consideration, including all unaffiliated stockholders. For additional information concerning the appointment of the Special Committee and its determination of the fairness of the Cash Consideration, , see "Special Factors—Background of the Reverse Split; Alternatives Considered by the Board," "Special Factors—Reports, Opinions and Appraisals," and "Special Factors—Factors Considered by the Board of Directors as to the Fairness of the Reverse Split."

- *Determination of the Board of Directors (page 15)*

After careful consideration of the recommendations of the Special Committee and various factors relating to the advisability and fairness of the Reverse Split, the Cash Consideration to be paid to stockholders for fractional shares resulting from the Reverse Split as recommended by the Special Committee, and the benefits and consequences of the Reverse Split, the Board of Directors determined that the Reverse Split is substantively and procedurally fair to, and in the best interests of, the Company's unaffiliated stockholders, whether they are cashed out or remain as stockholders of the Company. In determining the price to be paid for fractional shares, the Board of Directors considered the recommendations of the Special Committee. For additional information concerning the Special Committee, the fairness of the Reverse Split and the Board of Directors' approval of the Reverse Split, see "Special Factors—Reasons for the Reverse Split," "Special Factors—Factors Considered by the Board of Directors as to the Fairness of the Reverse Split" and "Special Factors—Effects of the Reverse Split on the Company."

- *Reservation of Right to Abandon the Reverse Split (page 19)*

Our Board of Directors has retained the right to abandon the Reverse Split, even though approved, if it determines prior to the Effective Date of the Reverse Split that the Reverse Split is not then in the Company's best interest or the best interest of the Company's stockholders. Among the circumstances the Board may consider in reaching a decision to abandon the Reverse Split is if the transaction becomes too expensive or there is a risk that it will not result in a reduction in the number of record holders to fewer than 300, which is required for the Company to file a Form 15 with the Commission and the termination of its SEC Reporting Obligations. For additional information

3

concerning the Board of Directors' right to abandon the Reverse Split, see "Special Factors—Reservation of Right to Abandon the Reverse Split."

- *Stockholder Approval*

Under Delaware law, the affirmative vote of the holders of a majority of the voting power of the outstanding shares of the Company's Common Stock and Preferred Stock is required to effect the Reverse Split. The Board of Directors has unanimously approved the effectuation of the Reverse Split.

Our Board of Directors has fixed the close of business on [     ], [     ], as the record date for determining which stockholders would be entitled to notice of and to vote at the Annual Meeting. On that date, 1,613,270 shares of the Company's Common Stock and [489,249] shares of Preferred Stock, net of 101,471 treasury shares, were outstanding.

- *Source of Funds for the Reverse Split (page 25)*

The Company plans to finance the Reverse Split with its available cash and cash equivalents. For more information, see "The Reverse Split—Source of Funds and Financial Effect of the Reverse Split." The Company's cash and cash equivalents, as of March 31, 2005, were approximately $19.8 million. However, the Company anticipates that its cash and cash equivalents will be reduced to approximately $9.8 million upon the occurrence of the scheduled April 22, 2005 redemption of $10.0 million of Preferred Stock. The Company expects to use these remaining funds to pay the Cash Consideration for any fractional shares and the other expenses incurred in connection with the Reverse Split.

- *Price Range of Common Stock (page 26)*

The Company's Common Stock and Preferred Stock is currently traded over the counter on the "Pink Sheets" (common symbol KGHI.PK; preferred symbol KGHIP.PK). The "Pink Sheets" is a centralized quotation service that collects and publishes market maker quotes in real time, primarily through its web site, http://www.pinksheets.com. Upon completion of the Reverse Split and filing the Form 15 with the Commission, the Company intends for such trading of its Common Stock and Preferred Stock to continue through the "Pink Sheets." On March 31, 2005, the last trading price for the Company's Common Stock was $28.50. For price ranges of the Company's Common Stock, see "Market for the Company's Common Stock and Dividend Policy."

- *Material Federal Income Tax Consequences (page 19)*

The Company believes the Reverse Split will be treated as a tax-free "recapitalization" for federal income tax purposes, which will result in no material federal income tax consequences to the Company. Depending on each stockholder's individual situation, the Reverse Split may give rise to certain income tax consequences for such stockholder. For additional information concerning the potential federal income tax consequences of the Reverse Split, see "Special Factors—Material Federal Income Tax Consequences."

4

## PROPOSAL NO. 1: AMENDMENT TO THE CERTIFICATE OF INCORPORATION

Stockholders are being asked to approve the Amendment to effectuate the Reverse Split. The purpose of the Reverse Split is to reduce the number of stockholders below 300, thereby allowing the Company to terminate its SEC Reporting Obligations and continue future operations as a non-reporting company, and thus relieving the Company of the costs and administrative burdens associated with operating as a public company subject to the SEC Reporting Obligations. If the Amendment is approved, each 20 shares of Common Stock held by a stockholder will be converted into one share. Fractional shares will be converted into cash based on a value of $29.25 per pre-split share. As of March 31, 2005, the Company had approximately 1,180 common stockholders of record holding an aggregate of approximately 1,613,270 outstanding shares of Common Stock of the Company.

In the event that Proposal No. 1 is approved by the stockholders, following the Reverse Split the Company anticipates that it will have approximately 220 common stockholders of record holding an aggregate of approximately 80,492 post-split shares of Common Stock of the Company. The Board of Directors adopted resolutions at a special meeting on March 31, 2005 setting forth (i) the proposed Amendment, (ii) the advisability of the Amendment, (iii) determination that the Reverse Split is advisable, in the best interests of, and substantively and procedurally fair to, the Company's unaffiliated stockholders, whether they are cashed out and/or remain as stockholders of the Company, (iv) approval of the Special Committee's recommendation to pay Cash Consideration for fractional shares in the amount of $29.25 per share, and (v) a call for submission of the Amendment for approval by the Company's stockholders at the Annual Meeting. Upon approval of the proposed Amendment by the stockholders, the proposed Amendment will become effective only upon filing of the Amendment with the Secretary of State of the State of Delaware. The Board of Directors may elect to abandon the reverse stock split at any time prior to the filing of the Amendment with the Secretary of State of the State of Delaware.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE APPROVAL OF THE AMENDMENT TO EFFECTUATE A ONE FOR 20 REVERSE STOCK SPLIT.**

## SPECIAL FACTORS

**Purpose of the Reverse Split**

The purpose of the Reverse Split is to terminate the Company's SEC Reporting Obligations and continue future operations as a non-reporting company, thereby relieving the Company of the costs and administrative burdens associated with operating as a company subject to the SEC Reporting Obligations. The Reverse Split will also relieve the Company of the burden of having a significant number of holders of a small number of shares.

The Company intends to accomplish these purposes by reducing the number of holders of record of the Company's Common Stock to fewer than 300 by cashing out the fractional shares that result from the Reverse Split.

5

**Background of the Reverse Split; Alternatives Considered by the Board**

The Company is a Delaware holding company formed on December 6, 2000 for the purpose of owning all of the outstanding stock of Kaiser Group International, Inc ("International"). International continues to own the stock of its remaining subsidiaries. On June 9, 2000, International and 38 of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court (the "Bankruptcy Court") for the District of Delaware (case nos. 00-2263 to 00-2301). International emerged from bankruptcy with a confirmed Plan of Reorganization (the Second Amended Plan of Reorganization (the "Plan")) that was effective on December 18, 2000.

Under the Plan, International sold some of its businesses and made payments of cash and stock to various classes of creditors. However, the effectiveness of the Plan did not in and of itself complete the bankruptcy process, as the process for resolving claims initially filed in the bankruptcy remains ongoing. One of the classes of claims recognized under the Plan was equity claims, consisting of holders of common stock of International ("International Common Stock") and other "Equity Interests" as defined in the Plan. Under the Plan, holders of Equity Interests received a number of shares of the Company's Common Stock equal to 17.65% of shares of such Common Stock issued to holders of allowed creditor claims. In the initial distribution under the Plan, one share of Company Common Stock was issued for each 96 shares of previously outstanding International Common Stock. The completion of this process required holders of International Common Stock to exchange certificates for International Common Stock for shares of Company Common Stock and cash. Many holders of International Common Stock have not completed that exchange, with the result that the Company has a significant number of very small shareholders.

Apart from holders of the International Common Stock, the only holders of Equity Interests of which the Company is aware are the former shareholders of ICT Spectrum Constructors, Inc. ("ICT Spectrum"), a corporation acquired by a merger with a subsidiary of International's predecessor in 1998. These shareholders claim to be entitled to additional shares of Company Common Stock, and International contested the nature and extent of this claim. On January 4, 2004, the Bankruptcy Court ruled in favor of the former shareholders of ICT Spectrum. The Bankruptcy Court refused to reconsider its decision, and the Company filed an appeal. As of date of this Proxy Statement, the appeal has not been resolved. In the event the Company is unsuccessful in its efforts to achieve a reversal of the Bankruptcy Court's ruling, the Company could be required to issue an additional 247,350 shares of Common Stock to former ICT Spectrum shareholders, which would compromise approximately 13.4% of the Company's aggregate Common Stock outstanding. Should the Company be required to issue additional shares of Common Stock after the Effective Date of the Reverse Split, such issuance will be made to former ICT Spectrum shareholders on a post-split basis, such that each former ICT Spectrum shareholder would receive one share of Common Stock for every 20 shares such person was entitled to pursuant to the Bankruptcy Court's ruling. The Company does not intend to issue fractional shares to the former ICT Spectrum shareholders and would instead pay, in lieu of fractional shares, $29.25 for each share of the Company's Common Stock that such former ICT stockholders would be entitled to receive immediately prior to the Effective Date of the Reverse Split.

As a result of the bankruptcy process, the Company now has only a limited number of activities, assets and liabilities, primarily consisting of the following:

• The Company owns Kaiser-Hill Company, LLC ("Kaiser Hill") equally with CH2M Hill Companies Ltd. Kaiser-Hill is the Company's major source of income. Kaiser-Hill currently serves as the general contractor at the U.S. Department of Energy's Rocky Flats Environmental Technology Site, a former Department of Energy nuclear weapons production

6

facility near Denver, Colorado. Kaiser-Hill has performed services for the Department of Energy at this site since 1995 and in January 2000 was awarded a new contract to manage the closure of the site. The level of success experienced by Kaiser-Hill in achieving timely closure of the Rocky Flats site, and the cost of achieving such closure, are the primary determinants of the Company's long-term financial performance.

- The Company has a substantial claim, pending resolution, against the owner of a steel mini-mill that it constructed for Nova Hut, s.a. in the Czech Republic. The engineering and construction of the mini-mill was completed in 2000 by a subsidiary of International called Kaiser Netherlands, B.V.

- Until September 30, 2002, the Company held a minority ownership interest in ICF Consulting Group, Inc. (a division that International sold in 1999). The Company continues to hold an 8½% subordinated promissory note from ICF Consulting due June 25, 2006 in the principal amount of $6.4 million as a result of that transaction.

- The Company has a wholly-owned captive insurance company that is not at this time issuing new policies and is solely involved in resolving remaining claims made against previously issued policies.

- The Company has an ongoing obligation to fund a capped post-employment medical benefit plan for a fixed group of retirees.

- The Company formed Kaiser Analytical Management Services, Inc. ("KAMS") in April 2004 to take over the operations of the Analytical Services Division of Kaiser-Hill. KAMS provides analytical management services such as sample planning, sample management, records management, performance assessment and data management in the general areas of health and safety, geotechnical, environmental and waste management, and deactivation and decommissioning.

Given the limited number of activities, assets and liabilities of the Company and its subsidiaries, the Company's Board of Directors has from time to time, since at least mid-2004, examined ways to reduce expenses and considered the benefits of continuing to be a company subject to the SEC Reporting Obligations.

After review and consideration of the benefits of being a company subject to the SEC Reporting Obligations, the Company announced on December 15, 2004 its intention to file a Form 15 with the Commission to deregister its Common Stock and suspend its reporting obligations under the Exchange Act, and become a non-reporting company. This decision was based upon advice from its transfer agent that the Company currently had less than 300 holders of record of its Common Stock. Upon further review of the stockholder records, the Company learned there were more than 300 holders of record of its Common Stock. Therefore, on February 17, 2005, the Company filed with the Commission an amended Form 15 withdrawing the previously filed Form 15. The Company was not required to file any reports with the Commission between the date of filing of the original and amended Forms 15.

The Company has determined that although maintaining the Company's public status caused the Company to incur significant costs, it received no significant benefit from such status, and that, notwithstanding the costs associated with reducing its holders of record of Common Stock below 300, terminating the Company's SEC Reporting Obligations would result in significant cost savings.

7

In order to apply to terminate the Company's SEC Reporting Obligations, the Company would have to reduce the number of record holders of the Company's Common Stock to fewer than 300. In February, 2005, the Company's management requested that the Company's legal counsel present to the Board of Directors alternative transaction structures that would cause the Company to have fewer than 300 stockholders.

On March 16, 2005, the Board of Directors considered the alternative transaction structures outlined by the Company's legal counsel, including procedures for a tender offer and a reverse stock split. The Board did not discuss other alternatives. It was determined that the Reverse Split would be the best means of reducing the number of record holders below 300. In reaching this determination, the Board discussed the fact that, with a tender offer, a large number of stockholders would be required to take action in order to receive a relatively small payment. Based in part on the Company's experience during 2001 with an odd-lot tender offer, the Board did not believe that a sufficient number of stockholders would respond to a tender offer.

The Board also considered that a significant reason for its large number of very small stockholders is that, as described above, in accordance with the terms of the Plan, each 96 shares of International Common Stock were automatically converted into one share of the Company's Common Stock, with fractional holders entitled to receive cash. Many of those holders of International Common Stock have made no attempt over the past several years to exchange their International Common Stock certificates for a certificate representing the Company's Common Stock and cash in lieu of fractional shares.

The Board of Directors then unanimously approved of the creation of a one-person special committee of the Board of Directors (the "Special Committee") to consider the proposed Reverse Split and the Cash Consideration to be paid to stockholders in the Reverse Split. The Board of Directors then appointed Frank E. Williams, Jr., an independent director, as the sole member of the Special Committee. Based upon its review, the Special Committee would make a recommendation to the entire Board of Directors regarding the Cash Consideration to be paid and the advisability of the Reverse Split.

The Special Committee considered the retention of a financial advisor to the Special Committee for purposes of delivering a fairness opinion. After consideration of costs and other variables associated with retaining a financial advisor, especially given the relative uniqueness of the Company and its limited assets, activities and operations and the fact that the aggregate Cash Consideration estimated to be paid to stockholders in connection with the Reverse Split is approximately $225,000, the Special Committee determined not to obtain a formal fairness opinion from a financial advisor. Instead, the Special Committee consulted with management and KAS Consulting and its principal, Kenneth A. Schweers. KAS Consulting and Mr. Schweers assisted the Special Committee and the Company's management in compiling relevant financial information as described below for the Special Committee's review. KAS Consulting and Mr. Schweers were consulted by the Special Committee in light of Mr. Schweers' familiarity with the Company. From 1976 to 1994, Mr. Schweers was an officer of the Company's predecessor, ICF Kaiser International, Inc. Since 1994, Mr. Schweers has worked from time to time as an independent consultant for the Company, advising the Company with respect to strategic alternatives. Mr. Schweers has no equity ownership interest in the Company and has received less than $100,000 in consulting fees from the Company during the past fiscal year.

On March 31, 2005 the Special Committee completed its review of the data provided by management and KAS Consulting in connection with the valuation of the Company's Common Stock. This information included:

8

- Data concerning the historical market prices and trading volume of the Company's Common Stock;

- Projected cash flows from the Company's limited operations, including its ownership interest in Kaiser Hill, KAMS, and the prospects for a recovery on its claims related to Nova Hut, all of which remain quite uncertain;

- Possible discount rates to apply to the projected cash flows;

- The Company's disclosures in its periodic filings with the Commission as to its operations, prospects and risks;

- The likely timing of further redemptions of the Company's Preferred Stock; and

- The trading prices of the stock of public companies that might be considered comparable to the Company.

The Special Committee did not receive a formal report from KAS Consulting, but instead considered the information compiled and provided by management and KAS Consulting as background for its determination of a price that would be fair, from a financial point of view, to those stockholders receiving the Cash Consideration, including all unaffiliated stockholders. After considering the data referred to above and the relatively unique character of the Company, the Special Committee determined that the data compiled and provided by management and KAS Consulting supported a price close to the market price of the Common Stock. As a result, the Special Committee determined that, although the market for the Company's Common Stock is very thin, it appears that the market price of the Common Stock represents the market's view as to the present value of the Company's risk-adjusted future cash flows. Accordingly, the Special Committee examined the last bid and ask prices for the Company's Common Stock as quoted through the Pink Sheets as well as the closing sale price for the Common Stock as of March 31, 2005. The last ask price as of March 31, 2005 was $30.00 and the last bid price as of the same date was $28.50. Thus, the Special Committee recommended to the Board of Directors that (i) a price equal to the average of the last bid and ask prices on March 31, 2005, or $29.25 per share, would be advisable and fair, and (ii) the Cash Consideration and the Reverse Split both be approved.

On March 31, 2005 the entire Board of Directors held a special telephonic meeting during which the Special Committee reported in detail its recommendations to the Board. The Board of Directors discussed extensively the Special Committee's recommendations, agreed with its rationale, and decided to proceed with the Reverse Split. The Board then unanimously ratified and approved the Special Committee's recommendation and unanimously approved a one for 20 reverse split of the Company's Common Stock with fractional shares receiving $29.25 per share. The selected Reverse Split ratio was a result of calculations intended to determine how many shares needed to be "cashed-out" to achieve the Company's goal of deregistration. The Board then unanimously recommended that the stockholders approve the transaction.

Neither the Special Committee nor the Board of Directors considered at length the book value ($12.83 per share on a fully diluted basis as of December 31, 2004) or liquidation value of the Company in determining the cash consideration for fractional shares. The Special Committee and the Board of Directors believed that such values were not fair indications of the value of the Company. The Company has not received during the past two years any offers for any merger, consolidation, sale or transfer of all or any substantial part of the assets of the Company, or purchase that would enable the purchaser to exercise control of the Company. Therefore, the Board of Directors did not consider any firm offers for any such acquisition.

9

**Reasons for the Reverse Split**

*Cost-Savings*

The Company incurs direct and indirect costs associated with its status as a public-reporting company. Among the most significant are the costs associated with compliance with the SEC Reporting Obligations. Direct costs associated with compliance with the SEC Reporting Obligations include, but are not limited to:

- auditing fees;

- legal fees;

- financial printer fees; and

- miscellaneous clerical and other administrative expenses, such as word processing, conversion to EDGAR, telephone and fax charges associated with the filing of periodic reports with the Commission.

Based on the Company's experience in prior years, the Company's direct costs of complying with the SEC Reporting Obligations are estimated to be approximately $125,000 annually, based on estimated annual audit and accounting fees of $30,000, estimated annual legal fees of $20,000, estimated financial printer fees of $25,000, estimated transfer agent fees of $10,000, estimated costs associated with filing reports with the Commission (including internal administrative staff) of $35,000 and estimated miscellaneous costs of $5,000. As a comparison, the Company estimates that the fees payable in connection with the reverse stock split will be approximately $130,000, excluding the amount of $150,000 the Company estimates will be payable for fractional shares resulting from the Reverse Split. The Company did not compare such cash payment for fractional shares with the costs of complying with the SEC Reporting Obligations since the cash payment will be made directly to the Company's stockholders holding fractional shares after the Reverse Split and will result in each share (on a pre-Reverse Split basis) held by remaining stockholders representing a greater ownership interest following the Reverse Split and the cancellation of resulting fractional shares.

Indirect costs associated with compliance with the SEC Reporting Obligations include, among other things, the time the Company's executive officers expend to prepare and review the Company's periodic reports, which the Company estimates requires 20% of the total time the executive officers expend in the management of the Company. Because the Company has only a few executive personnel, these indirect costs are substantial. For the calendar year ended December 31, 2006, the Company will be subject to additional regulations and compliance procedures required of public companies under the Sarbanes-Oxley Act of 2002. The Company estimates that the direct and indirect costs identified above related to implementation of the new regulations and compliance will range between $750,000 and $1.0 million and ongong total costs of compliance may result in as much as $500,000, annually. These costs are substantial when compared to the Company's total general and administrative expenses for 2004 of $5.3 million.

The Company anticipates that it will continue to incur some costs associated with soliciting proxies for purposes of its annual meeting as required under Delaware law, as well as meeting other state corporate law requirements. However, these costs should be significantly less than the direct and indirect costs of complying with the SEC Reporting Obligations as described above.

10

The Board of Directors considered the cost to the Company of continuing to file periodic reports with the Commission and complying with the proxy and annual report requirements under the Exchange Act compared to the benefits to the Company and its stockholders of continuing to operate as a public company. Under the circumstances, the Board determined that the benefits that the Company and its stockholders would typically expect to derive from the Company's status as a public company are not being realized and are not likely to be realized in the foreseeable future. As a result, the Board of Directors concluded that the elimination of the costs of complying with the Company's SEC Reporting Obligations outweighed the benefits of continuing to incur such costs.

The Company is, therefore, undertaking the Reverse Split at this time to save the Company the substantial costs, which are expected to increase over time, and resources required to comply with the SEC Reporting Obligations and other obligations associated with operating as a public-reporting company. However, the actual savings to be realized from terminating the Company's SEC Reporting Obligations may be higher or lower than such estimates.

### Lack of Capital from Public Sector

The Company's circumstances are such that it is not likely to be able to take advantage of the capital available through the public markets. The Company's Board of Directors does not have any present intent to raise capital through sales of the Company's securities in a public offering or to acquire other business entities using the Company's Common Stock as the consideration for such acquisition. Accordingly, the Company has not and is not likely to make use of, or benefit from, the advantages generally associated with operating as a public company.

For each of the reasons set forth above, the Company's Board of Directors does not believe the costs associated with maintaining the Company's SEC Reporting Obligations and maintaining the Company's stockholder accounts with less than 20 shares are justified. The Company's Board of Directors believes that it is in the Company's best interest and the best interest of the Company's stockholders as a whole to eliminate the administrative burden and costs associated with maintaining the Company's SEC Reporting Obligations and maintaining stockholder accounts of fewer than 20 shares.

### Factors Considered by the Board of Directors as to the Fairness of the Reverse Split

The Board of Directors has analyzed the Reverse Split and its anticipated effects on the Company's stockholders, and all of the members of the Company's Board of Directors deemed the Reverse Split and related termination of the Company's SEC Reporting Obligations to be substantively and procedurally fair to, and in the best interests of, the Company's affiliated and unaffiliated stockholders, whether they are cashed out and/or remain as stockholders following the Reverse Split. In reaching this conclusion, the Board of Directors considered, in no particular order and without preference, the following factors:

### Substantive Factors Favoring the Reverse Split

The Reverse Split offers stockholders the opportunity to dispose of their holdings consistent with recent market prices. The Board of Directors considered the recommendations of the Special Committee and the factors described above, including the historical average trading prices and current trading price of the Company's Common Stock, to determine the $29.25 price per share amount to be paid to stockholders who will have fractional shares of the Company's Common Stock as a result of the Reverse Split and will, therefore, receive cash in lieu of fractional shares following the Reverse Split. On March 31, 2005, the closing price for the Company's Common Stock was $28.50.

11

The purposes of the Reverse Split are to reduce the number of holders of a small number of shares and thereby allow the Company to terminate its SEC Reporting Obligations and continue future operations as a non-reporting company. The Reverse Split ratio is a result of calculations recommended by the Special Committee that were intended to determine how many shares needed to be eliminated, or "cashed-out," to reduce the number of record holders to fewer than 300. Both the Special Committee and the entire Board of Directors feel the current ratio of one for 20 is fair because it was calculated without bias towards any one group of stockholders. The ratio will be applied equally to all shares of the Company's Common Stock. In selecting the ratio, the Board of Directors was careful not to use a ratio that would result in Tennenbaum & Company LLC beneficially owning more than 50% of the outstanding voting power of the Company after the effectiveness of the Reverse Split, which would have triggered a right of the holders of the Company's Preferred Stock to require the Company to redeem shares of Preferred Stock held by electing holders.

It should, however, be noted that, as a result of cancellation of the fractional shares, the major stockholders of the Company will slightly increase their ownership interest in the Company following the Reverse Split. See "Procedural Factors Disfavoring the Reverse Split and Interests of the Company's Directors and Executive Officers in the Reverse Split." As a result of the Reverse Split, the stockholders who own more than 20 shares, such as certain of the Company's executive officers and directors, will slightly increase their percentage ownership interest in the Company. However, both the Special Committee and the Board of Directors noted that, because the affiliated stockholders currently own a dominant majority of ownership interest in the Company and have effective control of the Company, any increase in ownership percentage by the affiliated stockholders resulting from the Reverse Split will not have a material impact on the ability of affiliated stockholders to control the Company or the inability of the unaffiliated stockholders to control the Company. Therefore, the Board of Directors, based upon the recommendation of the Special Committee, determined that the fact that the per share consideration to be paid in the Reverse Split will be the same for every stockholder was a more material factor than any slight increase in the already dominant majority ownership of the Company by the affiliated stockholders.

### Procedural Factors Favoring the Reverse Split

The Reverse Split provides the Company's stockholders with liquidity . The average daily trading volume for the Company's Common Stock over the last three months was approximately 442 shares per day, which renders the Common Stock illiquid by most standards. The Reverse Split will provide stockholders who hold fewer than 20 shares at the Effective Time of the Reverse Split the opportunity to liquidate their investment in the Company.

The Reverse Split includes the ability to remain a stockholder of the Company . Another factor considered by the Company's Board of Directors in determining the procedural fairness of the transaction to unaffiliated stockholders is that current holders of fewer than 20 shares of the Company's Common Stock may elect to remain stockholders of the Company by acquiring sufficient shares in the open market so they hold at least 20 shares in their account immediately prior to the Reverse Split. However, see "Procedural Factors Disfavoring the Reverse Split and Interests of the Company's Directors and Executive Officers in the Reverse Split." Also, as noted above, as a result of the Reverse Split, the stockholders who own more than 20 shares will increase their percentage ownership interest in the Company as a result of the Reverse Split. The Company's Board of Directors considers the structure of the Reverse Split to be fair to all stockholders because it allows them to control the decision of whether to remain a stockholder of the Company following the Reverse Split or to receive the Cash Consideration offered in connection with the Reverse Split, although the ability to acquire the Company's Common Stock in the open market may be limited, given the Company's historic lack of trading volume.

12

The Board of Directors determined that there will not be a significant loss of a public market for the Company's Common Stock resulting from the Reverse Split for unaffiliated stockholders who elect to remain stockholders of the Company, since the Company anticipates that its Common Stock will continue to trade through the "Pink Sheets."

The Board of Directors noted that the unaffiliated stockholders who elect to purchase in the open market sufficient shares to remain stockholders of the Company will continue to own a small percentage of the Company in comparison to the dominant majority of ownership interest in the Company by the affiliated stockholders after the Reverse Split. However, the Board also noted that, because the affiliated stockholders currently own a very significant ownership interest in the Company and, therefore, have effective control of the Company, any increase in ownership percentage by the affiliated stockholders resulting from the Reverse Split will not have a material impact on the ability of affiliated stockholders to control the Company or the inability of the unaffiliated stockholders to control the Company after the Reverse Split. Finally, the Board of Directors noted that that the unaffiliated stockholders who elect to purchase sufficient shares to remain stockholders of the Company will have no guarantee of dividends in the future. The Board of Directors also noted that the Company has never paid dividends and that the stockholders would have no guarantee of dividend payments even if the Company elected not to consummate the Reverse Split. Therefore, the Board of Directors determined that, because the adverse effect on the liquidity of the Company's Common Stock and minority position of unaffiliated stockholders will likely not be material, providing the opportunity for stockholders to remain stockholders after the Reverse Split was a procedural factor favoring the Reverse Split. Furthermore, since the lack of interest in the Company's Common Stock would make it more difficult for stockholders to sell their shares, providing a mechanism for stockholders who own less than 20 shares to completely liquidate their ownership interest was a procedural factor favoring the Reverse Split since such stockholders would have had limited opportunity to cost effectively liquidate their shares in the present public market for the Company's Common Stock due to the lack of interest in the Company's Common Stock and small ownership interest.

No Unusual Conditions to the Reverse Split. The Board also considered the likelihood that the Reverse Split would be implemented. In this regard it took into consideration that there are no unusual requirements or conditions to the Reverse Split, and the fact that the Company has the financial resources to implement the Reverse Split expeditiously.

### Substantive Factors Disfavoring the Reverse Split

Cessation of Public Sale Opportunities. Following the Reverse Split, the Company will apply for the termination of its SEC Reporting Obligations. It is possible that the public market for shares of the Company's Common Stock could be substantially reduced, although the Company intends for its Common Stock to continue to trade through the Pink Sheets. Additionally, the Company does not have any present intention or plans to sell the Company or enter into any other transaction that would provide liquidity for the shares.

However, because only approximately 7.4% of the shares of the Company's outstanding Common Stock have been traded over the past 12 months, the current public market is highly illiquid. Since, as a practical matter, there currently exists very little liquidity for the Company's Common Stock, the Company's Board of Directors believes that deregistering will have little effect on unaffiliated stockholders and will be outweighed by the benefits of terminating the Company's SEC Reporting Obligations.

Cessation of Publicly Available Information. Upon terminating the Company's SEC Reporting Obligations, the Company will no longer file, among other things, annual or quarterly reports with the

13

Commission. Information regarding the Company's business, results of operations and financial condition that is currently available to the general public and the Company's investors will not be available once the Company terminates the registration of the Company's securities and the Company's SEC Reporting Obligations. As a result of termination of the Company's SEC Reporting Obligations, the remaining stockholders after the Reverse Split will not receive the benefit of the protection provided to stockholders of a company subject to SEC Reporting Obligations, including, but not limited to, certain corporate governance, reporting, and management certifications required under the Sarbanes-Oxley Act of 2002 and disclosure and liability applicable to reports and statements made pursuant to the requirements of the Exchange Act. The Company intends to continue to report to its stockholders in accordance with Delaware law. In addition, the Company presently intends to report its quarterly and annual financial results through its web site and in press releases. The Board of Directors does not believe this factor makes the transaction unfair to unaffiliated stockholders because any detriment to unaffiliated stockholders that may result from the termination of the registration of the Company's securities and the Company's periodic filings will be offset by the anticipated cost-saving benefits to the Company of no longer publicly filing such reports.

Inability to participate in any future increase in the value of the Company's Common Stock . Stockholders who are cashed out as a result of the Reverse Split will have no further interest in the Company with respect to their cashed out shares, and thus will not have the opportunity to participate in the potential upside of any increase in the value of such shares. The Company's Board of Directors determined that this factor does not make the transaction unfair to unaffiliated stockholders because those unaffiliated stockholders who desire to hold shares of the Company's Common Stock after the Reverse Split can do so by acquiring sufficient shares in the open market so that they hold at least 20 shares in their account immediately prior to the Reverse Split.

***Procedural Factors Disfavoring the Reverse Split and Interests of the Company's Directors and Executive Officers in the Reverse Split***

Among the factors weighing against the procedural fairness of the Reverse Split is the fact that approval of the majority of unaffiliated stockholders will not be required, that the applicable laws do not provide for appraisal rights to stockholders of the Company, and that a majority of non-employee directors did not engage an unaffiliated representative to act solely on behalf of unaffiliated stockholders for the purposes of negotiating the terms of the Reverse Split. However, even though it was not required, the Board of Directors unanimously approved the Reverse Split. Furthermore, the Board established a Special Committee to consider the proposed Reverse Split and the per share cash price to be paid to stockholders in the Reverse Split. The Special Committee also consulted with a third party independent consultant and with management, who assisted in compiling financial data for the Special Committee's review in connection with its assessment of the appropriate Cash Consideration.

First and foremost, the Reverse Split will be applied equally to all shares of the Company, whether held by affiliated or unaffiliated stockholders. Second, unlike a third party tender offer or a repurchase of shares by the Company, there is no party to negotiate on behalf of the unaffiliated stockholders. Since the Board of Directors is tasked with determining a fair price to offer all stockholders and since, considering that the maximum number of shares that will be converted in the Reverse Split to cash consideration for any one stockholder is less than 20 shares (representing less than $555.75), the Board of Directors determined that the expense of motivating an unaffiliated stockholder to negotiate the price or represent solely the interest of the unaffiliated stockholders would have been impractical. Third, the Board appointed a Special Committee to consider the fairness of the proposed Reverse Split and the per share cash price to be paid to stockholders in the Reverse Split. Fourth, the Board of Directors includes individuals with years of investment experience. Finally, the Board of Directors believes its long-standing familiarity with the Company, the Company's unique history and financial condition, and

14

the Company's prospects make the time and expense of negotiating with an independent representative unnecessary. Furthermore, the Board of Directors noted that the applicable laws of the State of Delaware, the jurisdiction under which the Company is incorporated, do not provide for appraisal rights for the fair value of the shares of Common Stock of the Company for stockholders who do not vote in favor of the Reverse Split. Despite the fact that the Reverse Split has not been structured to require an approval of a majority of unaffiliated stockholders for the reasons discussed above or provide for appraisal rights, the Board of Directors determined that, because (1) the consideration to be paid for each share of Common Stock of the Company will be the same in the Reverse Split irrespective of whether such shares are held by affiliated or unaffiliated stockholders, (2) the Reverse Split cannot, by its structure, result in converting more than 19 shares (representing less than $555.75) per stockholder, (3) the cash consideration to be paid for fractional shares was recommended by a Special Committee of the Board, and (4) unaffiliated stockholders will be able to convert a greater percentage of their holdings of shares of Common Stock of the Company than the affiliated stockholders would be able to so convert, such factors favor the procedural fairness to unaffiliated stockholders and sufficiently protect the rights of the unaffiliated stockholders of the Company in the Reverse Split.

**Recommendation of the Board; Fairness of the Reverse Split**

Based upon the recommendations of the Special Committee, the Board of Directors of the Company has **unanimously approved the Reverse Split and declared it advisable, in the best interests of, and substantively and procedurally fair to, the Company's unaffiliated stockholders, whether they are cashed out or remain as stockholders of the Company. The Board of Directors recommends that stockholders vote "FOR" approval of the Amendment to effectuate the Reverse Split. See "— Factors Considered by the Board of Directors as to the Fairness of the Reverse Split" above.**

**Effects of the Reverse Split on Stockholders Who Hold Fewer than 20 Shares of the Company's Common Stock in a Single Account**

When the Reverse Split is effected, stockholders holding fewer than 20 shares of the Company's Common Stock in a single account immediately prior to the Effective Date of the Reverse Split will not receive a fractional share of the Company's Common Stock as a result of the Reverse Split, but rather shall receive cash equal to $29.25 for each share of the Company's Common Stock held immediately prior to the Effective Date of the Reverse Split ("Cashed-Out Stockholders"). Given the historical illiquidity of the Company's Common Stock, the Company believes the structure of the Reverse Split to be a benefit to the Cashed-Out Stockholders. Among the potential detriments of the Reverse Split is the fact that after the Reverse Split, Cashed-Out Stockholders will have no further ownership interest in the Company, and will no longer be entitled to vote as a stockholder or share in the Company's future assets, earnings, or profits. The Cashed-Out Stockholder's only right will be to receive cash for their shares of Common Stock.

All amounts owed to the Cashed-Out Stockholders as a result of the Reverse Split will be subject to applicable federal and state income taxes. Additional details regarding the federal tax consequences are described later in this Proxy Statement under the heading "Certain Material Federal Income Tax Consequences."

As soon as practical after the consummation of the Reverse Split, the Company or the Company's transfer agent will mail a letter of transmittal to each stockholder. The letter of transmittal will contain instructions for the surrender of the stock certificate or certificates to the Company's exchange agent in exchange for the payment of the Cash Consideration. No cash payment will be made to any stockholder until the stockholder has surrendered his or her outstanding certificate(s), together with the letter of

15

transmittal, to the Company's exchange agent. For more detailed information, see the section entitled "Stock Certificates." After the Reverse Split, stockholders will have no further rights as stockholders with respect to the fractional shares, whether or nor such stockholder has been paid for such fractional shares.

**Effects of the Reverse Split on Stockholders Who Hold 20 or More Shares of the Company's Common Stock in a Single Account**

When the Reverse Split is effected, stockholders with 20 or more shares of the Company's Common Stock in a single account immediately prior to the Effective Date of the Reverse Split ("Remaining Stockholders") will:

- as of the Effective Date of the Reverse Split, have his or her shares of Common Stock converted into post-split Common Stock and will receive one new share of Common Stock for every 20 shares of pre-split Common Stock in his or her account; and

- in lieu of receiving fractional shares, receive cash equal to $29.25 for each share of the Company's Common Stock that are held immediately prior to the Effective Date of the Reverse Split and not otherwise converted to post-split Common Stock.

While the Remaining Stockholders will benefit from having the opportunity to share in the future successes of the Company, if any, among the detriments of the Reverse Split to the Remaining Stockholders is the fact that they will not have the option to cost effectively liquidate all of their shares like the Cashed-Out Stockholders. Further, once the Company is non-reporting, it may be even more difficult for the Remaining Stockholders to value, and therefore, sell their shares of Common Stock if they should so desire.

**General Examples of Potential Effects of the Reverse Split**

In general, the results of the Reverse Split can be illustrated by the following examples:

| Hypothetical Scenario | Result |
|---|---|
| Stockholder A is a registered stockholder who holds 10 shares of the Company's Common Stock in her record account on the Effective Date of the Reverse Split. | Instead of receiving a fractional share of the Company's Common Stock immediately after the Reverse Split, Stockholder A's 10 shares will be converted into the right to receive $292.50  (10 x $29.25). |
| | Note: If Stockholder A wants to continue her investment in the Company, she can buy at least 10 more shares of the Company's Common Stock in the open market and hold the shares in her record account. Stockholder A would have to act far enough in advance of the Effective Date of the Reverse Split so that the purchase is complete before the close of business on that date. |

16

| | |
|---|---|
| Stockholder B has two separate record accounts. As of the Effective Date of the Reverse Split, he holds 10 shares of the Company's Common Stock in one account and 10 shares of the Company's Common Stock in the other. All of his shares are registered in his name only. | Stockholder B will be entitled to receive cash payments equal to the number of shares of the Company's Common Stock that he holds in each record account, instead of receiving fractional shares. Stockholder B would receive two checks totaling $585 (10 x $29.25 = $292.50, 10 x $29.25 = $292.50; $292.50 + $292.50 = $585.00).<br><br>Note: If Stockholder B wants to continue his investment in the Company he can consolidate his two accounts prior to the Effective Date of the Reverse Split. In that case, his holdings will not be cashed out in connection with the Reverse Split because he will hold 20 shares of the Company's Common Stock in one record account, which would convert to one share of the Company's Common Stock. He would have to act far enough in advance so that the consolidation is complete before the close of business on the Effective Date of the Reverse Split. |
| Stockholder C holds 45 shares of the Company's Common Stock in his record account as of the Effective Date of the Reverse Split. | After the Reverse Split, Stockholder C will hold two shares in his record account (45/20 = 2.25) and, instead of receiving a fractional share of the Company's Common Stock immediately after the Reverse Split, Stockholder C's unconverted 5 shares will be converted into the right to receive $146.25 (5 x $29.25). |

**Effects of the Reverse Split on the Company**

The Reverse Split is expected to reduce the number of the Company's stockholders and the number of the Company's outstanding shares of Common Stock. The Company's Certificate of Incorporation currently authorizes the issuance of 3,000,000 shares of Common Stock, $0.01 par value. As of March 31, 2005, 1,613,270 shares of the Company's Common Stock were outstanding. Fractional shares of Common Stock that result from the Reverse Split will be acquired for cash and cancelled. Such cancelled shares will become authorized but unissued shares of the Company's Common Stock. The Company believes that the Reverse Split will reduce the number of holders of record of the Company's Common Stock from 1,180 to approximately 220, assuming approximately 3,420 shares of pre-split Common Stock are cashed out.

Our Common Stock is currently registered under the Exchange Act and consequently the Company is subject to the SEC Reporting Obligations of the Exchange Act. The Company believes the Reverse Split will reduce the number of record holders of Common Stock from approximately 1,180 to approximately 220, which will allow the Company to file to terminate the Company's SEC Reporting Obligations and continue future operations as a non-reporting company, and thereby relieving the Company of the costs, administrative burdens and competitive disadvantages associated with a operating as a public company.

Based on the aggregate number of stockholders of the Company's Common Stock, and the number of stockholders of record owning more than 20 shares of the Company's Common Stock as of the Record Date, the Company estimates that payments of cash in lieu of the issuance of fractional shares to

17

Cashed Out Stockholders will total approximately $100,000. The maximum amount that the Company would be required to pay to the remaining 220 holders of record to cash out any fractional shares would be $122,265. If stockholders holding less than 20 shares of the Company's Common Stock purchase sufficient shares of the Company's Common Stock in the open market to remain stockholders following the Reverse Split, then the number of holders of record of the Company's Common Stock may not be reduced below 300 and the Company may be ineligible to terminate its SEC Reporting Obligations.

The Company believes the completion of the Reverse Split and the subsequent termination of the Company's SEC Reporting Obligations may cause the market for shares of the Company's Common Stock to be substantially reduced or possibly eliminated. The Company's Common Stock is currently traded through the Pink Sheets, which is a centralized quotation service that collects and publishes market maker quotes in real time, primarily through its web site, http://www.pinksheets.com. The Company intends for this source of liquidity to continue to be available to the Company's stockholders following the Reverse Split.

The Company's Common Stock will continue to have the same par value following the consummation of the Reverse Split. In addition, each post-Reverse Split share of the Company's Common Stock will be entitled to one (1) vote per one (1) whole share.

The Company has no current plans to issue Common Stock, but the Company reserves the right to do so at any time and from time to time at such prices and on such terms as the Company's Board of Directors determines to be in the Company's best interests and the best interests of the Company's then stockholders. The Company has no current plans or proposals to effect any extraordinary corporate transaction such as a merger, reorganization or liquidation, to change the Company's Board of Directors or management, to change materially the Company's or capitalization, or otherwise to effect any material change in the Company's corporate structure of business. However, as referenced above, the Company may be required to issue shares of Common Stock to former ICT Spectrum shareholders pursuant to a ruling of the Bankruptcy Court. Such issuance would be made to former ICT Spectrum shareholders on a post-split basis, such that each former ICT Spectrum shareholder would receive one share of Common Stock for every 20 shares to which such person would be entitled. The Company does not intend to issue fractional shares to the former ICT Spectrum shareholders and would instead pay, in lieu of fractional shares, $29.25 for each share of the Company's Common Stock that such former ICT Spectrum shareholders would be entitled to received immediately prior to the Effective Date of the Reverse Split.

The Company is undertaking the Reverse Split at this time because, among other reasons, the Company believes that it will save substantial costs associated with having a significant number of small shareholders and compliance with the SEC Reporting Obligations. However, the Company's cost saving estimates may be inaccurate, and the actual savings to be realized from terminating the Company's SEC Reporting Obligations might be higher or lower than the Company's estimates.

**Conduct of the Company's Business after the Reverse Split**

Following the Reverse Split and filing of a Form 15 with the Commission, the Company will no longer be a public-reporting company, but rather will operate as a non-reporting company. The Company expects the Company's business and operations to continue as they are currently being conducted, and the Reverse Split is not anticipated to have any material effect upon the conduct of the Company's business. The Company expects to be subject to substantially the same risks and uncertainties after the Reverse Split.

18

**Reports, Opinions and Appraisals**

Other than consulting on an informal basis with KAS Consulting, neither the Special Committee nor the Board obtained any independent assessment of the fairness of the terms of the Reverse Split or the value of the Company's Common Stock. Neither the Special Committee nor the Board obtained a fairness opinion, appraisal or other report on the fairness of the Cash Consideration.

**Reservation of Right to Abandon the Reverse Split**

The Company's Board of Directors retains the right to abandon the Reverse Split, even though approved, if it determines prior to the Effective Date of the Reverse Split that the Reverse Split is not then in the Company's best interest or the best interest of the Company's stockholders. Among the circumstances that might cause the Board to abandon the Reverse Split is a significant risk of the Reverse Split failing to achieve the overall goal of reducing the number of record holders to fewer than 300, or where the expense of cashing out the stockholders with fewer than 20 shares becomes so high that the transaction become financially prohibitive. If the Reverse Split is not implemented, then the Company will be unable to terminate the Company's SEC Reporting Obligations until the Company has fewer than 300 holders of record of the Company's Common Stock.

**Appraisal Rights**

No appraisal rights are available under the Delaware General Corporation Law to stockholders who dissent from the Reverse Split. There may exist other rights or actions under state law for stockholders who are aggrieved by reverse stock splits generally. Although the nature and extent of such rights or actions are uncertain and may vary depending upon facts or circumstances, stockholder challenges to corporate action in general are related to the fiduciary responsibilities of corporate officers and directors and to the fairness of corporate transactions. For example, stockholders could, if they deemed such to be applicable, take appropriate legal action against the Company and its Board of Directors, and claim that the transaction was unfair to the unaffiliated stockholders, and/or that there was no justifiable or reasonable business purpose for the Reverse Split.

**Material Federal Income Tax Consequences**

Set forth below are the material federal income tax consequences to the Company and the Company's stockholders resulting from the Reverse Split. This discussion is based on existing U.S. federal income tax law, which may change, even retroactively. This discussion also assumes that the stockholders have held and will continue to hold their shares as capital assets under the Internal Revenue Code of 1986, as amended. This discussion does not discuss all aspects of federal income taxation, including aspects that may be important to stockholders in light of their individual circumstances. Many stockholders, such as banks, financial institutions, insurance companies, broker-dealers, tax-exempt organizations, and securities traders that elect market-to-market tax accounting treatment, may be subject to special tax rules. Other stockholders may also be subject to special tax rules, including but not limited to: stockholders who received the Company's Common Stock as compensation for services or pursuant to the exercise of an employee stock option, or stockholders who have held, or will hold, stock as part of a straddle, hedging, or conversion transaction for federal income tax purposes. In addition, this summary does not discuss any state, local, foreign, or other tax considerations.

For purposes of this discussion, a U.S. person means any of the following: (1) a citizen or resident of the United States; (2) a corporation or other entity taxable as a corporation created or organized under U.S. law (federal or state); (3) an estate the income of which is subject to U.S. federal income taxation regardless of its sources; (4) a trust if a U.S. court is able to exercise primary supervision over

19

administration of the trust and one or more U.S. persons have authority to control all substantial decisions of the trust, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person; and (5) any other person whose worldwide income and gain is otherwise subject to U.S. federal income taxation on a net basis. As the used herein, the term "U.S. Holder" means a beneficial owner of the Company's Common Stock that is a U.S. person, and the term "non-U.S. Holder" means a beneficial owner of the Company's Common Stock that is not a U.S. person.

The Company urges stockholders to consult their own tax advisor as to the particular federal, state, local, foreign, and other tax consequences, in light of their specific circumstances. If a partnership holds the Company's Common Stock, the tax treatment of a partner generally will depend upon the status of the partner and upon the activities of the partnership. If the stockholder is a partner of a partnership holding the Company's Common Stock, the Company suggests that such stockholder consult its tax advisor.

### Federal Income Tax Consequences to the Company

The Company believes that the Reverse Split should be treated as a tax-free "recapitalization" for federal income tax purposes. This should result in no material federal income tax consequences to the Company.

### Federal Income Tax Consequences to Stockholders Receiving No Cash from the Reverse Split

If a stockholder (1) continues to hold the Company's Common Stock immediately after the Reverse Split, and (2) receives no cash as a result of the Reverse Split, such stockholder should not recognize any gain or loss in the Reverse Split. The aggregate adjusted tax basis in such shares of the Company's Common Stock held immediately after the Reverse Split should be equal to the aggregate adjusted tax basis in the shares of Common Stock held immediately prior to the Reverse Split and the stockholder should have the same holding period in the Common Stock as it had in such stock immediately prior to the Reverse Split.

### Federal Income Tax Consequences to Stockholders Receiving Cash

If a stockholder receives cash as a result of the Reverse Split, its tax consequences will depend on whether, in addition to receiving cash, it or a person or entity related to it continues to hold the Company's Common Stock immediately after the Reverse Split, as explained below.

Stockholders Who Exchange All of Their Common Stock for Cash as a Result of the Reverse Split. If a stockholder (1) receives cash in exchange for a fractional share as a result of the Reverse Split, (2) does not continue to hold any of the Company's Common Stock immediately after the Reverse Split, and (3) is not related to any person or entity which holds the Company's Common Stock immediately after the Reverse Split, such stockholder will recognize capital gain or loss. The amount of capital gain or loss such stockholder recognizes will equal the difference between the cash received for the cashed-out stock and the aggregate adjusted tax basis in such stock.

If a stockholder is related to a person or entity who continues to hold the Company's Common Stock immediately after the Reverse Split, such stockholder will recognize gain or loss in the same manner as set forth in the previous paragraph, provided that such receipt of cash either (1) is "not essentially equivalent to a dividend," or (2) is a "substantially disproportionate redemption of stock," as described below.

20

*Not Essentially Equivalent to a Dividend* . A stockholder will satisfy the "not essentially equivalent to a dividend" test if the reduction in its proportionate interest in the Company resulting from the Reverse Split is considered a "meaningful reduction" given the particular facts and circumstances. The Internal Revenue Service ("IRS") has ruled that a small reduction by a minority stockholder whose relative stock interest is minimal and who exercises no control over the affairs of the corporation will meet this test.

*Substantially Disproportionate Redemption of Stock* . The receipt of cash in the Reverse Split will be a "substantially disproportionate redemption of stock" for a stockholder if (i) it owns less than 50% of the outstanding shares of the Company's Common Stock after the Reverse Split, and (ii) the percentage of the outstanding shares of the Company's Common Stock owned by such stockholder immediately after the Reverse Split is less than 80% of the percentage of shares of the Company's Common Stock owned by it immediately before the Reverse Split.

In applying these tests, the stockholder will be treated as owning shares actually or constructively owned by certain individuals and entities related to such stockholder. If the receipt of cash in exchange for the Company's Common Stock does not give rise to capital gain or loss under any of the tests, it will be treated first as ordinary dividend income to the extent of the stockholder's ratable share of the Company's undistributed earnings and profits, then as a tax-free return of capital to the extent of its aggregate adjusted tax basis in the shares, and any remaining amount will be treated as capital gain.

Stockholders Who Both Receive Cash and Continue to Hold the Company's Common Stock Immediately After the Reverse Split . If a stockholder both receives cash as a result of the Reverse Split and continues to hold the Company's Common Stock immediately after the Reverse Split, it generally will recognize gain, but not loss, in an amount equal to the lesser of (1) the excess of the sum of aggregate fair market value of its shares of the Company's Common Stock plus the cash received over its adjusted tax basis in the shares, or (2) the amount of cash received in the Reverse Split. The aggregate adjusted tax basis in such stockholder's shares of the Company's Common Stock held immediately after the Reverse Split will be equal to its aggregate adjusted tax basis in such shares of the Company's Common Stock held immediately prior to the Reverse Split, increased by any gain recognized in the Reverse Split, and decreased by the amount of cash received in the Reverse Split.

Any gain recognized in the Reverse Split will be treated, for federal income tax purposes, as capital gain, provided that the receipt of cash either (1) is "not essentially equivalent to a dividend" with respect to the stockholder, or (2) is a "substantially disproportionate redemption of stock" with respect to the stockholder as discussed above, under the heading "Stockholders Who Exchange All of Their Common Stock for Cash as a Result of the Reverse Split." In applying these tests, the stockholder will be treated as owning shares held by certain individuals and entities related to such stockholder, and the stockholder may take into account sales of shares of the Company's Common Stock that occur substantially contemporaneously with the Reverse Split. If the gain is not treated as capital gain under any of these tests, the gain will be treated as ordinary dividend income to the stockholder to the extent of its ratable share of the Company's undistributed earnings and profits, then as a tax-free return of capital to the extent of its aggregate adjusted tax basis in its shares, and any remaining gain will be treated as a capital gain.

*Dividend Income, Capital Gain and Capital Loss*

Recently enacted legislation reduced the maximum U.S. federal income tax rate applicable to dividends received from domestic corporations by an individual taxpayer to a maximum of 15%, subject to the requirements the individual must have held the stock with respect to which a dividend is distributed for a minimum of 61 days during the 120-day period beginning 60 days before the stock becomes ex-dividend.

21

A taxpayer's holding period for these purposes is reduced by periods during which the taxpayer's risk of loss with respect to the stock is considered diminished by reason of the existence of options, contracts to sell and similar transactions. The reduced rate of tax applies to dividends received before 2009. Individual stockholders should consult their own advisors as to their eligibility for the reduced rate of tax in relation to dividends on the Company's Common Stock.

Recent legislation also reduced the maximum U.S. federal income tax rate applicable to net capital gain (defined generally as the total capital gains in excess of capital losses for the year) recognized upon the sale of capital assets that have been held for more than 12 months to 15%. The reduced rate of tax applies to taxable years before 2009. Net capital gain recognized from the sale of capital assets that have been held for 12 months or less will continue to be subject to tax at ordinary income tax rates. Capital gain recognized by a corporate taxpayer will also continue to be subject to tax at the ordinary income tax rates applicable to corporations. For both individual and corporate taxpayers, there are significant limitations on the deductibility of capital losses.

### Information Reporting and Backup Withholding

In general, payments of dividends with respect to the Company's Common Stock are subject to information reporting. Each paying agent will be required to provide the IRS with information, including the name, address, taxpayer identification number of each U.S. Holder receiving payments, and the aggregate amount of dividends paid to such beneficial owner during the calendar year. These reporting requirements, however, do not apply to all beneficial owners. Specifically, corporations, securities broker-dealers, other financial institutions, tax-exempt organizations, qualified pension and profit sharing trusts and individual retirement accounts, and non-U.S. persons satisfying certain requirements are all excluded from reporting requirements.

U.S. Holders will be required to provide their social security or other taxpayer identification numbers and, in some instances, additional information, to the Company's transfer agent in connection with the Reverse Split to avoid backup withholding requirements that might otherwise apply. The letter of transmittal will require each stockholder to deliver such information when the Common Stock certificates are surrendered following the Effective Date of the Reverse Split. Backup withholding will apply if a U.S. holder (i) fails to establish its exemption from the information reporting requirements, (ii) is subject to the reporting requirements and fails to supply its correct taxpayer identification number in the manner required by applicable law, (iii) underreports its tax liability, or (iv) if the paying agent has been otherwise notified by the IRS to backup withhold. The backup withholding tax rate is currently 28%. This backup withholding tax is not an additional tax and may be credited against a U.S. Holder's federal income tax liability if the required information is furnished to the IRS.

### Special Rules for Non-U.S. Holders

If a stockholder is a non-U.S. Holder, its tax consequences will depend on whether its income or gain from the Reverse Split is effectively connected with the conduct of a U.S. trade or business, or, if there is an applicable treaty, is attributable to a permanent establishment maintained in the United States. Performance of significant personal services constitutes the conduct of a U.S. trade or business.

Income or Gain Not Effectively Connected with the Conduct of a U.S. Trade or Business . Except as described below under the heading "Income or Gain Effectively Connected with the Conduct of a U.S. Trade or Business", dividends (including deemed dividends) paid on the Company's Common Stock held by a non-U.S. holder will be subject to U.S. federal withholding tax (but not the federal income tax) at a rate of 30% or lower treaty rate, if applicable. In order to claim a reduction of withholding under a tax treaty, a non-U.S. holder generally will be required to file IRS Form W-8BEN upon which the non-U.S.

22

holder certifies, under penalty of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate with respect to such payments. Further, a non-U.S. holder will generally not be subject to U.S. federal income or withholding tax on gain realized on the taxable disposition of the Company's Common Stock.

Income or Gain Effectively Connected with the Conduct of a U.S. Trade or Business . If dividends paid to a non-U.S. holder are effectively connected with the conduct of a U.S. trade or business by the non-U.S. holder or, if required by a tax treaty, the dividends are attributable to a permanent establishment maintained in the United States by the non-U.S. holder, the Company and other payors generally are not required to withhold tax from the dividends, provided that the non-U.S. holder furnishes a valid IRS Form W-8ECI certifying, under penalty of perjury, that the holder is a non-U.S. person, and the dividends are effectively connected with the holder's conduct of a U.S. trade or business and are includible in the holder's gross income. Effectively connected dividends will be subject to U.S. federal income tax on net income that applies to U.S. persons generally (and, with respect to corporate holders under certain circumstances, the branch profits tax).

In the case of any gain that is effectively connected with the conduct of a U.S. trade or business by a non-U.S. holder (and, if required by a tax treaty, any gain that is attributable to a permanent establishment maintained in the United States), the non-U.S. holder will generally be taxed on its net gain derived from the disposition at the regular rates and in the manner applicable to U.S. persons and, if the non-U.S. holder is a foreign corporation, the branch profits tax may also apply.

### *Backup Withholding and Information Reporting*

The Company must report annually to the IRS and to each non-U.S. holder the amount of dividends paid to that holder and the tax withheld from such dividend payments. These reporting requirements apply regardless of whether withholding was reduced or eliminated by any applicable tax treaty. Copies of the information returns reporting dividend payments and any withholding thereof may also be made available to the tax authorities in the country in which the non-U.S. holder is a resident under the provisions of an applicable income tax treaty or agreement.

A non-U.S. holder will generally not be subject to additional information reporting or to backup withholding with respect to dividend payments on the Company's Common Stock, or to information reporting or backup withholding with respect to payments of proceeds from the disposition of the Company's Common Stock to or through a U.S. office of any broker, as long as the holder has furnished to the payor or broker: (i) a valid IRS Form W-8BEN certifying, under penalties of perjury, its status as a non-U.S. person; (ii) other documentation upon which it may rely to treat the payments as made to a non-U.S. person in accordance with Treasury regulations; or (iii) otherwise establishes an exemption.

Any amounts withheld under the backup withholding rules from a payment to a non-U.S. holder will be allowed as a credit against such holder's U.S. federal income tax liability, if any, or will otherwise be refundable, provided that the requisite procedures are followed and the proper information is filed with the IRS on a timely basis. Non-U.S. holders should consult their own tax advisors regarding their qualification for exemption from backup withholding and the procedure for obtaining such an exemption, if applicable.

As explained above, the amounts paid to a stockholder as a result of the Reverse Split may result in dividend income, capital gain income, or some combination of dividend and capital gain income to such stockholder depending on its individual circumstances. The Company urges each stockholder to consult its tax advisor as to the particular federal, state, local, foreign, and other tax consequences of the transaction, in light of the specific circumstances.

23

**Regulatory Approvals**

The Company is not aware of any material governmental or regulatory approval required for completion of the transaction, other than compliance with the applicable federal and state securities laws and the corporate laws of the State of Delaware.

**THE REVERSE SPLIT**

**Basic Terms**

The Company expects that it will, upon approval of the proposal to amend the Certificate of Incorporation to effectuate the Reverse Split, file the Certificate of Amendment with the Delaware Secretary of State to effect a one for 20 reverse split of the Company's Common Stock as approved by the Company's Board of Directors on March 31, 2005. Under the terms of the Reverse Split, every holder of record on the Effective Date of the Reverse Split will be entitled to receive one share of the Company's Common Stock for every 20 shares held by such person. No fractional shares will be issued. Instead, the Company will pay, in lieu of fractional shares, $29.25 for each share of the Company's Common Stock held by a holder immediately before the Effective Date of the Reverse Split and not converted to whole shares of Common Stock of the Company after the Reverse Split.

If a stockholder would be a Cashed Out Stockholder as a result of the Reverse Split and wants to continue to hold Common Stock of the Company after the Reverse Split, it may do so by completing either of the following actions before the close of business on the Effective Date for the Reverse Split:

- purchase a sufficient number of shares of Common Stock of the Company in the open market and have them registered in such stockholder's name and consolidated with its current record account if it is a record holder, or have them entered in its account with a nominee, such as its broker or bank, in which it currently hold shares of Common Stock of the Company, so that such stockholder holds at least 20 shares of Common Stock of the Company in its account immediately prior to the Effective Date for the Reverse Split; or

- if applicable, consolidate its record accounts, or its accounts with nominees, so that it holds at least 20 shares of Common Stock of the Company in a single account immediately prior to the Effective Date for the Reverse Split.

Because of the limited trading market for the Company's Common Stock, however, a stockholder might be unable to purchase enough shares to retain an equity interest in the Company.

The Company intends for the Reverse Split to treat stockholders holding Common Stock in street name through a nominee, such as a bank or broker, in the same manner as stockholders whose shares are registered in their names. Nominees will be instructed to effect the Reverse Split for their beneficial holders. Accordingly, the Company also refers to those street name holders who receive a cash payment instead of fractional shares as Cashed Out Stockholders. However, nominees may have different procedures, and stockholders holding shares in street name should contact their nominees.

The Reverse Split is structured to be an Rule 13e-3 transaction under the Exchange Act because it is intended to, and if completed will likely, reduce the number of record holders of the Company's

24
