**Regulatory Approvals**

The Company is not aware of any material governmental or regulatory approval required for completion of the transaction, other than compliance with the applicable federal and state securities laws and the corporate laws of the State of Delaware.

## THE REVERSE SPLIT

**Basic Terms**

The Company expects that it will, upon approval of the proposal to amend the Certificate of Incorporation to effectuate the Reverse Split, file the Certificate of Amendment with the Delaware Secretary of State to effect a one for 20 reverse split of the Company's Common Stock as approved by the Company's Board of Directors on March 31, 2005. Under the terms of the Reverse Split, every holder of record on the Effective Date of the Reverse Split will be entitled to receive one share of the Company's Common Stock for every 20 shares held by such person. No fractional shares will be issued. Instead, the Company will pay, in lieu of fractional shares, $29.25 for each share of the Company's Common Stock held by a holder immediately before the Effective Date of the Reverse Split and not converted to whole shares of Common Stock of the Company after the Reverse Split.

If a stockholder would be a Cashed Out Stockholder as a result of the Reverse Split and wants to continue to hold Common Stock of the Company after the Reverse Split, it may do so by completing either of the following actions before the close of business on the Effective Date for the Reverse Split:

- purchase a sufficient number of shares of Common Stock of the Company in the open market and have them registered in such stockholder's name and consolidated with its current record account if it is a record holder, or have them entered in its account with a nominee, such as its broker or bank, in which it currently hold shares of Common Stock of the Company, so that such stockholder holds at least 20 shares of Common Stock of the Company in its account immediately prior to the Effective Date for the Reverse Split; or

- if applicable, consolidate its record accounts, or its accounts with nominees, so that it holds at least 20 shares of Common Stock of the Company in a single account immediately prior to the Effective Date for the Reverse Split.

Because of the limited trading market for the Company's Common Stock, however, a stockholder might be unable to purchase enough shares to retain an equity interest in the Company.

The Company intends for the Reverse Split to treat stockholders holding Common Stock in street name through a nominee, such as a bank or broker, in the same manner as stockholders whose shares are registered in their names. Nominees will be instructed to effect the Reverse Split for their beneficial holders. Accordingly, the Company also refers to those street name holders who receive a cash payment instead of fractional shares as Cashed Out Stockholders. However, nominees may have different procedures, and stockholders holding shares in street name should contact their nominees.

The Reverse Split is structured to be an Rule 13e-3 transaction under the Exchange Act because it is intended to, and if completed will likely, reduce the number of record holders of the Company's

24

Common Stock to fewer than 300, which will permit the Company to terminate the Company's SEC Reporting Obligations. In connection with the Reverse Split, the Company has filed a Rule 13e-3 Transaction Statement on Schedule 13E-3 with the Commission. The Company intends to apply for the termination of the Company's SEC Reporting Obligations as soon as practicable after the Effective Date of the Reverse Split.

**Effective Time**

The Effective Date of the Reverse Split will be the date that the Delaware Secretary of State accepts the Amendment for filing.

**Stock Certificates**

The Company's transfer agent, EquiServe Trust Company, N.A., has been appointed as the Company's exchange agent to carry out the exchange of existing stock certificates for new Common Stock certificates and to send cash payments in lieu of fractional shares. Promptly following the Effective Date of the Reverse Split, the transfer agent will send a letter of transmittal to each affected stockholder, which will describe the procedures for surrendering stock certificate(s) in exchange for new Common Stock and/or, if applicable, the Cash Consideration. Upon receipt of the stock certificate(s) and properly completed letter(s) of transmittal, the transfer agent will issue the appropriate new stock certificate(s) and/or make the appropriate cash payment within approximately 20 business days.

No service charges will be payable to the Company by stockholders in connection with the exchange of certificates and/or the payment of cash in lieu of issuing fractional shares, although stockholders who hold shares through a nominee, such as a broker or bank, may incur service charges in connection with the exchange. The Company will not pay interest on cash sums due to any such stockholder in connection with the Reverse Split.

All stock certificates outstanding immediately prior to the Effective Date of the Reverse Split evidencing ownership of the Company's Common Stock shall be deemed cancelled without further action by the stockholders as of the Effective Date of the Reverse Split. *Do not send any stock certificates to the Company or the Company's transfer agent except as specified in the letter of transmittal.*

**Provision for Unaffiliated Stockholders**

Neither the Company, nor any executive officer or director thereof nor any person controlling the Company has made any provision in connection with the Reverse Split to grant unaffiliated stockholders access to the corporate files of the Company or to obtain counsel or appraisal services at the expense of the Company.

**Source of Funds and Financial Effect of the Reverse Split**

The total cash the Company will pay to Cashed Out Stockholders is estimated to be approximately $100,000. The total cash the Company will pay to Remaining Stockholders for fractional shares is estimated to be no more than $122,265. The Company expects to finance the Cash Consideration to be paid in connection with the Reverse Split and other expenses for the Reverse Split through the Company's available cash and cash equivalents. The Reverse Split and the use of approximately $280,000 in cash to complete the Reverse Split, which includes professional fees and other expenses related to the transaction and cash payments to be made in lieu of issuing fractional shares, are not expected to have any material adverse effect on the Company's capitalization, liquidity, results of operations or cash flow.

25

The Company's cash and cash equivalents, on March 31, 2005, was approximately $19.8 million. However, the Company anticipates that its cash and cash equivalents will be reduced to approximately $9.8 million upon the occurrence of the scheduled April 22, 2005 redemption of $10.0 million of Preferred Stock. The Company expect to use a portion of these remaining funds to pay the Cash Consideration for the fractional shares and other expenses incurred in connection with the Reverse Split.

### Fees and Expenses

The following is a reasonably itemized statement of the fees and expenses that have been incurred or that are estimated to be incurred in connection with the Reverse Split and the transactions related thereto:

- $150,000 in Cash Consideration for fractional shares;
- $80,000 to the Company's legal counsel;
- $15,000 to the Company's financial consultant;
- $15,000 for printing and other costs in connection with the mailing of this Proxy Statement; and
- $20,000 for transfer agent services.

### Accounting Consequences

The Reverse Split will not affect the par value of the Company's Common Stock, which will remain at $0.01 per share. The Reverse Split will result in an increase in per share net income or loss and net book value of the Company's Common Stock because fewer shares of the Company's Common Stock will be outstanding. The Company's financial statements, incorporated herein by reference, do not reflect the Reverse Split.

### Certain Legal Matters

The Company is not aware of any license or regulatory permit that appears to be material to the business of the Company that might be adversely affected by the Reverse Split, nor any approval or other action by any governmental, administrative or regulatory agency or authority, domestic or foreign, that would be required to consummate the Reverse Split, other than approvals, filings or notices required under federal and state securities laws and the filing of the Amendment with the Delaware Secretary of State.

### Market Prices of the Common Stock and Dividend Policy

Since December, 2004, The Company's Common Stock is traded over-the-counter through the Pink Sheets under the symbol "KGHI.PK." Prior to that time, the Company's Common Stock traded on the Over-the-Counter Bulletin Board under the symbol "KGHI." The following table sets forth the range of high and low closing prices for the calendar periods set forth below.

26

|  | HIGH | | LOW | |
|---|---|---|---|---|
| Calendar 2005 (through March 31, 2005) | $ | 29.00 | $ | 24.00 |
| Calendar 2004 | | | | |
| First quarter | $ | 24.00 | $ | 19.00 |
| Second quarter | $ | 27.00 | $ | 21.00 |
| Third quarter | $ | 26.50 | $ | 24.00 |
| Fourth quarter | $ | 27.00 | $ | 23.00 |
| Calendar 2003 | | | | |
| First quarter | $ | 8.00 | $ | 4.70 |
| Second quarter | $ | 13.00 | $ | 6.10 |
| Third quarter | $ | 21.50 | $ | 12.20 |
| Fourth quarter | $ | 22.80 | $ | 15.00 |

There were approximately 1,180 common stockholders of record as of March 31, 2005.

The Company has never declared any dividends on the Common Stock, and the Board of Directors does not currently intend to pay any cash dividends on the Common Stock in the foreseeable future. Payment of cash dividends by the Company is at the discretion of its Board of Directors and is dependent on its earnings, financial condition, capital requirements and other relevant factors.

27

## SUMMARY FINANCIAL INFORMATION

The following summary of historical consolidated financial data was derived from the Company's audited consolidated financial statements as of and for the fiscal years ended December 31, 2004, 2003, 2002 and 2001 and of International for the year ended December 31, 2000, have been derived from our and/or International's audited consolidated financial statements. Certain reclassifications have been made to the prior period financial statements to conform the presentation used in the December 31, 2003 consolidated financial statements. This financial information is only a summary and should be read in conjunction with the financial statements of the Company and other financial information, including the notes thereto, contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, which information is incorporated by reference in this Proxy Statement. See "Other Matters — Incorporation by Reference" and "—Where You Can Find More Information."

| | | Successor Company | | | Predecessor Company |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2003 | 2002 | 2001 | 2000 |
| **Statement of Operations Data:** | | | | | |
| Gross revenue | $ 1,036 | $ — | $ — | $ — | $ 271,385 |
| Service revenue | 288 | — | — | — | 76,018 |
| Operating loss | (6,364) | (4,918) | (7,028) | (10,792) | (224) |
| Income (loss) from continuing operations before reorganization items, income taxes, minority interest, extraordinary items and cumulative effect of accounting change | 9,110 | 11,028 | 29,165 | 7,657 | (1,736) |
| Income (loss) before extraordinary items and cumulative effect of accounting change | 7,375 | 4,368 | 18,343 | (4,957) | 29,762 |
| Basic and Diluted Earnings per share: | | | | | |
| Continuing operations before extraordinary items and cumulative effect of accounting change | $ 4.62 | $ 2.92 | $ 8.60 | $ 1.92 | $ 1.74 |
| Discontinued operations, net of tax | — | (1.14) | 0.31 | (9.11) | (0.46) |
| Extraordinary items, net of tax | — | — | — | — | 5.35 |
| Total | $ 4.62 | $ 1.78 | $ 8.91 | $ (7.19) | $ 6.63 |
| Weighted average common shares outstanding: | | | | | |
| —basic | 1,597 | 1,594 | 1,590 | 1,119 | 23,255 |
| —diluted | 1,597 | 1,594 | 1,590 | 1,119 | 23,255 |

| | Successor Company | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2003 | 2002 | 2001 | 2000 |
| **Balance Sheet Data (end of period):** | | | | | |
| Total assets | $ 72,714 | $ 74,080 | $ 96,195 | $ 80,891 | $ 106,168 |
| Working capital | 3,364 | 3,343 | 22,048 | 23,974 | 54,131 |
| Long-term liabilities* | 26,909 | 35,175 | — | — | — |
| Mandatorily Redeemable preferred stock ** | — | — | 55,942 | 62,481 | — |
| Shareholders' equity | 27,545 | 20,077 | 17,805 | 3,360 | 87,500 |
| Book Value Per Share | $ 12.83 | $ 5.96 | $ 2.33 | $ (9.00) | $ 2.83 |

---

\* After the adoption of FAS 150 on July 1, 2003, the Company reclassified mandatorily redeemable preferred stock from mezzanine equity to long term liabilities. At December 31, 2004 and 2003, long term liabilities consist entirely of mandatorily redeemable preferred stock.

\*\* After the adoption of FAS 150 (see Note 3 to the Consolidated Financial Statements), the Company reclassified mandatorily redeemable preferred stock to long term liabilities from mezzanine equity. Additionally, as we did not complete

the initial bankruptcy distribution until April 17, 2001, no shares of New Preferred were actually outstanding as December 31, 2000.

28

## PROPOSAL NO. 2: ELECTION OF DIRECTORS

Consistent with the Bylaws of the Company, the Board of Directors has fixed the size of the Board of Directors at four (4) members and has nominated Mr. Jon B. Bennett, Mr. Douglas W. McMinn, Mr. Mark S. Tennenbaum and Mr. Frank E. Williams, Jr. for election to a one-year term ending at the 2006 Annual Meeting of Stockholders or until their successors are duly elected.

**Nominees for Election to the Board of Directors Each for a One-Year Term Expiring at the 2006 Annual Meeting of Stockholders**

Jon B. Bennett, 49, director of Kaiser Holdings, has been a Director of Information Management at Devens Reserve Forces Training Area, a Department of the Army installation, since 1998. Mr. Bennett has been a director of Kaiser Holdings since December 18, 2000. Mr. Bennett was Systems Administrator and Analyst at the then Fort Devens from 1995 to 1997, and was the senior Budget Analyst at Fort Devens from 1990 to 1995. Mr. Bennett graduated from Bucknell University (B.A.). Entities managed by Bennett Management Corporation, which is controlled by Mr. Bennett's brother, James Bennett, are significant holders of the Preferred Stock and Common Stock issued by Kaiser Holdings in April 2001, as a result of being significant holders of subordinated notes of Kaiser Group International, Inc. ("Old Kaiser"). Mr. Bennett owns 2,250 shares of Common Stock and no shares of Preferred Stock.

Douglas W. McMinn, 57, has been President and Chief Executive Officer of Kaiser Holdings since September 2004. Mr. McMinn has been a director of Kaiser Holdings since September 2004 and also serves on the Board of Managers of Kaiser-Hill Company, LLC. Mr. McMinn has been a senior officer of the Company and its predecessors for more than 17 years. Mr. McMinn is the Chief Executive Officer of Global Trade & Invest, Inc., a firm which he co-founded to engage in international trading activities and to provide consulting assistance to companies doing business internationally. Mr. McMinn served in the United States Government as a staff member in the National Security Council and as an Assistant Secretary of State for Economic and Business Affairs, U.S. Department of State. Mr. McMinn owns 1,000 shares of Common Stock and no shares of Preferred Stock.

Mark S. Tennenbaum, 45, has been a director of Kaiser Holdings since September 2004. Mr. Tennenbaum is a private investor. Mr. Tennenbaum was chief financial officer and co-founder of FrontBridge Technologies, Inc. Prior to FrontBridge Technologies, Inc., Mr. Tennenbaum served as chief financial officer of SoftAware Networks, Inc. Mr. Tennenbaum owns 200,000 shares of Common Stock and no shares of Preferred Stock. Entities controlled by Mr. Tennenbaum's father, Michael E. Tennenbaum, are significant holders of the Company's Common Stock and Preferred Stock.

Frank E. Williams, Jr., 70, Chairman of the Board of Directors of Kaiser Holdings, currently serves as chairman and principal owner of Williams Enterprises of Georgia, Inc., a holding company controlling six subsidiaries active in various facets of the steel industry. In addition, Mr. Williams serves as Chairman, CEO, and 50-percent owner of Williams & Beasley Co., a major erector of steel products in the Southwestern US, and Chairman and a major shareholder of Wilfab, Inc., a fabricator of structural steel. Mr. Williams serves as a member on the Board of Directors of Harbor Capital National Bank and Diamond Head Casino Corporation. Mr. Williams is also Managing Partner and principal owner of Structural Concrete Products LLC (SCP), a manufacturer of prestressed concrete building systems, and of Industrial Alloy Fabricators (IAF), a fabricator of alloy plate products for the pulp and chemical industries. Mr. Williams previously founded and served as President, CEO and Chairman of Williams Industries, Inc. of Falls Church, Virginia, a public Nasdaq-listed company that owns five subsidiaries

29

active in the steel industry, including Williams Bridge Co., one of the largest fabricators of steel plate for bridge structures in the Mid-Atlantic region. Mr. Williams currently serves as a director of Williams Industries, Inc. Mr. Williams owns 17,012 shares of Common Stock and 6,097 shares of Preferred Stock.

THE BOARD OF DIRECTORS RECOMMENDS THAT THE STOCKHOLDERS VOTE FOR THE NOMINEES SET FORTH ABOVE.

## Information Regarding the Board of Directors

During the year ended December 31, 2004, the Board of Directors held four board meetings. All directors attended at least 75% of the 2004 meetings of the Board of Directors and its committees they were eligible to attend.

To assist the Board of Directors in carrying out its responsibilities, the Board of Kaiser Holdings has delegated certain authority to two committees, the current membership of which are as follows.

Committees of the Board of Directors

| Compensation Committee | Audit Committee |
|---|---|
| Mr. Bennett *Chairman* | Mr. Williams *Chairman* |
| Mr. Williams | Mr. Bennett |
| Mr. Tennenbaum | Mr. Tennenbaum |

*Audit Committee* . The Audit Committee is responsible for the selection, and reviews and accepts the reports, of the Company's independent accountants. The Audit Committee met seven times during the year ended December 31, 2004. At the present time each member of the Audit Committee is "independent" as defined under the National Association of Securities Dealers ("NASD") listing standards. The Company's Board of Directors has determined that it does not have an "audit committee financial expert," as defined in applicable rules of the SEC, serving on its audit committee at the present time. Given the small size of the Board, the Company's limited operations, and the nature and number of its stockholders, the Board has determined that it is not necessary to have an audit committee financial expert at the present time. The Board of Directors may consider adding a person who would qualify as an audit committee financial expert to the Board and audit committee in the future.

*Compensation Committee* . The Compensation Committee (a) reviews and approves (or recommends to the entire Board of Directors) the annual salary, bonus, and other benefits (direct and indirect) of the Chief Executive Officer and other executive officers, (b) reviews and submits to the full Board recommendations concerning, and amendments to, new executive compensation or stock plans, and (c) establishes, and periodically reviews, the Company's policies in the area of management prerequisites. The Compensation Committee met two times during the year ended December 31, 2004.

*Compensation of Non-employee Directors.* Directors who are not employees of the Company ("Non-employee Directors") are paid $1,000 for attendance at each meeting of the Board of Directors; they are paid $500 for attendance at each meeting of a committee of the Board of Directors of which the director is a member. The Chairperson of each committee is paid $750 for attendance at each Board committee meeting. In addition, each Non-employee Director receives an annual retainer of $20,000, payable in advance in quarterly installments, and is reimbursed for expenses incurred in connection with Board service. In January 2002 the Company adopted a practice of making annual grants of 1,000 shares of Common Stock to each member of the Company's Board of Directors. Such grants are made pursuant

30

to the terms of the 2002 Equity Compensation Plan which was approved by the stockholders at the 2003 Annual Meeting. Directors who are employees of the Company do not receive separate cash compensation for their service as directors.

**Director Nomination Process**

The Board of Directors is responsible for nominating individuals to present to the stockholders as candidates for Board membership and for selecting individuals to fill Board vacancies. Given the small size of the Board, the Company's limited operations, and the nature and number of its stockholders, the Board has determined not to establish a Nominating and Governance Committee. The Corporate Governance Principles adopted by the Board of Directors require that a majority of the members of the Board of Directors be "independent" as determined in accordance with the listing standards of the NASD even though the Company is not subject to such listing standards. At the present time each member of the Board of Directors other than Mr. McMinn satisfies this standard.

The Board considers the mix of director characteristics, experiences and diverse perspectives and skills that are most appropriate to meet the Company's needs. The Board will consider potential nominees submitted by stockholders in accordance with applicable law and the Company's Bylaws as in effect from time to time.

The Company's Bylaws provide that n ominations of persons for election as directors of the Company may be made by or at the direction of the directors, by any nominating committee or other person appointed by the directors, or by any stockholder of the Company entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in Section 2.2 of the Company's Bylaws. Such nominations, other than those made by or at the direction of the directors, must be made pursuant to timely notice in writing to the Secretary of the Company. To be timely, a stockholder's notice must be received at the Company's principal executive offices, 9300 Lee Highway, Fairfax, Virginia 22031, not less than 60 days nor more than 90 days prior to the meeting. In the event that less than 75 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, to be timely the notice must be received not later than the close of business on the fifteenth day following the date on which such notice of the date of the meeting was mailed or such public disclosure was made, whichever first occurs. A stockholder's notice of nomination must set forth:

(a)   as to each person who is not an incumbent director whom a stockholder proposes to nominate for election or re-election as a director:

  (i)   the name, age, business address, and residence address of such person,

  (ii)   the principal occupation or employment of such person,

  (iii)   the class and number of shares of capital stock of the Company which are beneficially owned by such person, and

  (iv)   any other information relating to such person that is required to be disclosed in solicitation for proxies for elections of directors pursuant to the rules and regulations of the Commission under the Exchange Act, and

(b)   as to the stockholder giving the notice:

  (i)   the name and record address of such stockholder, and

  (ii)   the class and number of shares of capital stock of the Company which are beneficially owned by such stockholder.

Such notice shall be accompanied by the written consent of each proposed nominee to serve as a director of the Company if elected. The Company may require any proposed nominee to furnish such other information as reasonably may be required by the Company to determine the eligibility of such proposed

31

nominee to serve as a director of the Company. Persons nominated by stockholders for election as a director will not be eligible to serve as a director unless nominated in accordance with the foregoing procedures.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

A person is deemed to be a beneficial owner of the Company's equity securities if that person has voting and/or investment power with respect to such equity securities or has the right to acquire such equity securities within 60 days. The following table sets forth information regarding each person known by the Company to beneficially own 5% or more of the outstanding shares of Common Stock and Preferred Stock of the Company.

| Name and Address of Beneficial Owners of More Than 5% of the Common Stock of the Company | Amount and Nature of Beneficial Ownership of Shares of Common Stock of the Company | Amount and Nature of Beneficial Ownership of Shares of Preferred Stock of the Company (*Less than 1%) | Percent of Common Stock of the Company | Percent of Preferred Stock of the Company (*Less than 1%) |
|---|---|---|---|---|
| James D. Bennett Bennett Restructuring Fund, L.P. 2 Stamford Plaza, Suite 1501 281 Tresser Boulevard Stamford, CT 06901 | 219,848(a) | 104,562(b) | 13.6% | 21.4% |
| Michael E. Tennenbaum Tennenbaum & Co., LLC 11100 Santa Monica Boulevard, Suite 210 Los Angeles, CA 90025 | 752,899(c) | 157,122(d) | 46.7% | 32.1% |
| John Hancock Financial Services, Inc. John Hancock Place P.O. Box 111 Boston, MA 02117 | 81,949(e) | * | 5.1% | * |

---

(a)     The information with respect to 219,848 shares of Common Stock beneficially owned by James D. Bennett is based on a Report on Form 4 dated November 2002, which was filed with the Securities and Exchange Commission ("SEC") on December 11, 2002.

(b)     The information with respect to 104,562 shares of Preferred Stock was reported to the Company by James D. Bennett on March 31, 2004. Mr. Bennett declined to provide current ownership information of shares of Preferred Stock.

(c)     The information with respect to 752,899 shares of Common Stock beneficially owned by Michael E. Tennenbaum, including (1) 77,924 shares of Common Stock reported to be beneficially owned by Tennenbaum & Co., LLC, (2) 400,000 shares of Common Stock reported to be beneficially owned by Michael E. Tennenbaum 2002 Annuity Trust, and (3) 274,975 shares of Common Stock reported to be beneficially owned by Michael E. Tennenbaum and Suzanne S. Tennenbaum, trustees of the Tennenbaum Living Trust, is based on a Report on Form 4 dated April 3, 2003, which was filed with the Commission on April 3, 2003.

32

(d)    The information with respect to 157,122 shares of Preferred Stock beneficially owned by Michael E. Tennenbaum, including (1) 27,786 shares of Preferred Stock reported to be beneficially owned by Tennenbaum & Co., LLC, and (2) 129,336 shares of Preferred Stock reported to be beneficially owned by Michael E. Tennenbaum and Suzanne S. Tennenbaum, trustees of the Tennenbaum Living Trust, is based on a Report on Form 4 dated February 16, 2004, which was filed with the Commission on August 3, 2004.

(e)    The information with respect to 81,949 shares of Common Stock beneficially owned by John Hancock Financial Services, Inc. is based on a Report on Schedule 13G dated December 31, 2001, which was filed with the Commission on February 1, 2002.

The following table sets forth information regarding the beneficial ownership of shares of Common Stock and Preferred Stock by each director, by current executive officers named in the Summary Compensation Table on page 34 of this Report, and by all directors and current executive officers as a group. The information set forth below is current as of April 6, 2005.

| Certain Beneficial Owners of Shares of Common Stock of the Company | Amount and Nature of Beneficial Ownership of Shares of Common Stock of the Company (a) | Amount and Nature of Beneficial Ownership of Shares of Preferred Stock of the Company (a) | Percent of Common Stock of the Company (*Less than 1%) | Percent of Preferred Stock of the Company (*Less than 1%) |
|---|---|---|---|---|
| (i) Directors and Nominees for Director | | | | |
| Jon B. Bennett | 2,250 | 0 | * | * |
| Douglas W. McMinn | 1,000 | 0 | * | * |
| Mark S. Tennenbaum | 200,000 | 0 | | |
| Frank E. Williams, Jr. | 17,012 | 6,097 | * | * |
| (ii) Current Executive Officers | | | | |
| Douglas W. McMinn President and Chief Executive Officer | 1,000 | 0 | * | * |
| Marian P. Hamlett Executive Vice President and Chief Financial Officer | 100 | 0 | * | * |
| (iii) All Directors and Current Executive Officers as a Group (5 Persons) | 220,362 | 6,097 | | * |

(a)  All shares shown are held outright.

The information with respect to Mr. Tennenbaum's beneficial ownership of 200,000 shares of Common Stock is owned indirectly by the Michael E. Tennenbaum 2002 Annuity Trust.

The information with respect to Mr. Williams beneficial ownership of 17,012 shares of Common Stock includes (1) 6,500 shares of Common Stock reported to be beneficially owned by Mr. Williams, (2) 1,312 shares of Common Stock reported to be beneficially owned by Williams Family Foundation, (3) 6,300 shares of Common Stock reported to be beneficially owned by Williams Family LP, (4) 600 shares of Common Stock reported to be beneficially owned by Mr. Williams as trustee for minor grandchildren, (5) 300 shares of Common Stock reported to be beneficially owned by Mr. Williams as executor of his father's estate, and (6) 2,000 shares of Common Stock reported to be beneficially owned by Mrs. Williams. The information with respect to Mr. Williams beneficial ownership of 6,097 shares of Preferred Stock includes (1) 761 shares of Preferred Stock reported to be beneficially owned by Mr. Williams, (2) 487 shares of Preferred Stock reported to be beneficially owned by Mrs. Williams, (3) 1,699 shares of Preferred Stock

33

reported to be beneficially owned by Williams Family LP, (4) 150 shares of Preferred Stock reported to be beneficially owned by Mr. Williams as trustee for minor grandchildren, and (5) 3,000 shares of Preferred Stock reported to be beneficially owned by Williams Family Foundation. This beneficial ownership information was reported to be beneficially owned by Mr. Williams is based on a Report on Form 4 dated February 14, 2005, which was filed with the Commission on February 17, 2005.

## EXECUTIVE COMPENSATION

The following table shows the compensation received by each person who served as an executive officer of the Company during 2004, and the executive officers that were serving as of December 31, 2004.

### SUMMARY COMPENSATION TABLE

| Name, Principal Position and Period Ended December 31, | Annual Compensation | | | Other Annual Compensation | All Other Compensation |
|---|---|---|---|---|---|
| | Salary ($) | | Bonus ($) | | |
| Douglas W. McMinn, President and Chief Executive Officer (a) | | | | | |
| 2004 | $ 191,542 | | 0 | 0 | $ 28,000(b) |
| 2003 | — | | — | — | — |
| 2002 | — | | — | — | — |
| Marian P. Hamlett, Executive Vice President and Chief Financial Officer (c) | | | | | |
| 2004 | $ 146,077 | | 0 | 0 | $ 28,000(d) |
| 2003 | — | | — | — | — |
| 2002 | — | | — | — | — |
| John T. Grigsby, Jr. (e) | | | | | |
| 2004 | $ 228,469 | $ 450,000 | $ 22,000(f) | $ 28,000(i) |
| 2003 | $ 210,000 | $ 202,600 | $ 5,400(g) | $ 28,000(i) |
| 2002 | $ 213,461 | $ 250,000 | $ 4,900(h) | $ 28,000(i) |
| Marijo Ahlgrimm (j) | | | | | |
| 2004 | $ 23,431 | | 0 | 0 | $ 16,736(k) |
| 2003 | $ 19,148 | | 0 | 0 | $ 15,231(k) |
| 2002 | $ 27,856 | | 0 | 0 | $ 6,964(k) |

(a)    Mr. McMinn was appointed as President and Chief Executive Officer of the Company on September 9, 2004. Compensation for Mr. McMinn prior to 2004 is not presented. Mr. McMinn does not have an employment agreement with the Company.

(b)    The amount shown under "All Other Compensation" for Mr. McMinn relates to the Company match under the Company's Section 401(k) Plan.

(c)    Ms. Hamlett was appointed as Executive Vice President and Chief Financial Officer of the Company on April 15, 2004. Compensation for Ms. Hamlett prior to 2004 is not presented. Ms. Hamlett does not have an employment agreement with the Company.

(d)    The amount shown under "All Other Compensation" for Ms. Hamlett relates to the Company match under the Company's Section 401(k) Plan.

(e)    Mr. Grigsby served as President and Chief Executive Office of the Company until September 9, 2004.

(f)   Represents the fair market value of 1,000 shares of Common Stock granted to Mr. Grigsby on April 5, 2004.
(g)   Represents the fair market value of 1,000 shares of Common Stock granted to Mr. Grigsby on January 15, 2003.
(h)   Represents the fair market value of 2,000 shares of Common Stock granted to Mr. Grigsby on January 15, 2002.
(i)   For a description of the terms of an employment agreement entered into between Mr. Grigsby and the Company, see the discussion under "Employment Contracts and Termination of Employment Arrangements" below. The amounts shown under "All Other Compensation" for Mr. Grigsby comprise the following:

| | | | |
|---|---|---|---|
| 2004 | $ | 28,000 | Company match under the Company's Section 401(k) Plan |
| 2003 | $ | 28,000 | Company match under the Company's Section 401(k) Plan |
| 2002 | $ | 28,000 | Company match under the Company's Section 401(k) Plan |

(j)   Ms. Ahlgrimm served as Executive Vice President and Chief Financial Officer until April 15, 2004.
(k)   For a description of the terms of the employment arrangements between Ms. Ahlgrimm and the Company, see the discussion under "Employment Contracts and Termination of Employment Arrangements" below. The amounts shown under "All Other Compensation" for Ms. Ahlgrimm comprise the following:

| | | | |
|---|---|---|---|
| 2004 | $ | 16,736 | Company match under the Company's Section 401(k) Plan |
| 2003 | $ | 15,231 | Company match under the Company's Section 401(k) Plan |
| 2002 | $ | 6,964 | Company match under the Company's Section 401(k) Plan |

**Option Grants in 2004 and Aggregated Option Exercises in 2004 and December 31, 2004 Option Values**

There were no option grants to any of the named executive officers identified in the Summary Compensation Table on page 34 of this Proxy Statement during the year ended December 31, 2004. There were no unexercised stock options outstanding for stock of the Company as of December 31, 2004.

**Employment Contracts and Termination of Employment Arrangements**

John T. Grigsby, Jr. resigned as President, Chief Executive Officer and director of the Company effective August 31, 2004. As a result of his resignation, Mr. Grigsby's employment agreement with the Company and John T. Grigsby, Jr. terminated on August 31, 2004. In connection with his resignation, the Company and Mr. Grigsby entered into an agreement dated August 31, 2004 providing for Mr. Grigsby's transition.

Douglas W. McMinn was elected President and Chief Executive Officer with the Company effective September 9, 2004 to fill the vacancy created by the resignation of John T. Grigsby, Jr. The Company has not at this time entered into an employment agreement with Mr. McMinn in respect of his new positions.

35

## REPORT OF COMPENSATION COMMITTEE

During 2004, the Compensation Committee was comprised of Messrs. Bennett (Chair) and Williams, both of whom are "independent" as defined in the NASD listing standards.

The Company's employee compensation policy is tailored to its unusual circumstances, which involve principally the management and resolution of claims arising out of the continuing bankruptcy proceedings relating to International negotiations and proceedings relating to the Nova Hut project, and participating in the affairs of Kaiser-Hill Company, LLC. The Company's goal is to retain a sufficient number of employees necessary to carry out these activities and evaluate other opportunities the Company may want to pursue. The Board of Directors and the Compensation Committee believe it is in the best interest of the Company to retain a small number of knowledgeable and appropriately incentivized key employees.

The Compensation Committee reviews the annual salary, incentive compensation and other benefits paid to the President and Chief Executive Officer and other persons designated as executive officers under applicable Commission rules and regulations. In this connection, the Compensation Committee reviews the employment-related arrangements (both proposed and existing) with persons who are or will become executive officers.

The Compensation Committee annually reviews and approves the compensation of the Company's President and Chief Executive Officer.

At this time Mr. McMinn's compensation consists of a base annual salary of $225,000 and annual grants 1,000 shares of Common Stock.

The Compensation Committee has not yet reached a conclusion as to the appropriate incentive compensation program for Mr. McMinn.

Submitted by the Compensation Committee

Jon B. Bennett
Frank E. Williams, Jr.
Mark S. Tennenbaum

## AUDIT COMMITTEE REPORT AND INDEPENDENT ACCOUNTANT

### Audit Committee Report

The Audit Committee has reviewed and discussed with the Company's management and PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") the audited consolidated financial statements of the Company contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2004. The Audit Committee has also discussed with PricewaterhouseCoopers the matters required to be discussed pursuant to SAS No. 61 - Codification of Statements on Auditing Standards, AU Section

36

380 , as modified or supplemented, which includes, among other things, matters related to the conduct of the audit of the Company's consolidated financial statements.

The Audit Committee has received and reviewed the written disclosures and the letter from PricewaterhouseCoopers required by Independence Standards Board No. 1 (Independence Discussions with Audit Committees), as may be modified or supplemented, and has discussed with PricewaterhouseCoopers its independence from the Company.

The Company's policies with respect to pre-approval of non-audit services to be provided by the Company's independent accountants are discussed below. The Company is disclosing below fees paid to PricewaterhouseCoopers during the past two fiscal years under the heading "Independent Accountant's Fees."

Based on the review and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2004, as filed with the Commission on March 29, 2005.

Submitted by the Audit Committee

       Frank E. Williams, Jr.
       Jon B. Bennett
       Mark S. Tennenbaum

*The information contained in the above report shall not be deemed to be "soliciting material" or to be "filed" with the Securities and Exchange Commission, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference in such filing.*

**Independent Accountant's Fees**

Aggregate fees for professional services rendered by PricewaterhouseCoopers as of or for the years ended December 31, 2004 and 2003 , were:

| | Fiscal 2004 | Fiscal 2003 |
|---|---|---|
| **Audit Fees** | | |
| Annual audit of Kaiser Group Holdings, Inc. ** | $ 80,000 | $ 70,000 |
| Audit of Kaiser Netherlands, BV ** | — | 5,117 |
| Quarterly review procedures ** | 30,000 | 28,115 |
| Registration Statement on Form S-8 | — | 1,000 |
| | 110,000 | 104,232 |
| **Tax Fees** | | |
| Tax compliance work | — | 10,003 |
| Tax consulting – Canada | 7,459 | — |
| Other | — | 720 |
| | 7,459 | 10,723 |
| **Total** | $ 117,459 | $ 114,955 |

** The amounts included in Audit Fees are the fees billed *for* the respective years for the annual audit of the Company's financial statements and the review of quarterly financial statements and regulatory filings. The amounts included in each of the other categories are the fees billed *in* the respective years.

37

The Audit Committee approved in advance the use of PricewaterhouseCoopers for the tax-related services referred to above.

## Policies With Respect to Approval of Non-Audit Services

The Audit Committee's responsibilities include review and pre-approval of all audit and non-audit services performed by the independent auditors. In exercising that responsibility with respect to proposed engagements for non-audit services, the Audit Committee's Charter requires the Committee to give paramount consideration to the question of whether the engagement of the independent auditors to perform those services is likely to create a risk that independence of the independent auditors may be compromised. To that end, the Audit Committee endeavors to exercise its discretion in a manner that will avoid or minimize the risk of compromising the independence of the independent auditors.

The Audit Committee will typically be inclined to approve requests to engage the independent auditors to provide those types of non-audit services that are closely related to the audit services performed by the independent auditors, such as audit-related services, tax-compliance/return-preparation services, and "due diligence" services relating to transactions that the Company may be considering from time to time. Because such non-audit services bear a close relationship to the audit services provided by the independent auditors, the Audit Committee believes that they will not ordinarily present a material risk of compromising the independence of the independent auditors, subject to the Audit Committee's policy concerning the total amount payable to the independent auditors for non-audit services with respect to any fiscal year.

Between meetings of the Audit Committee, the Chairman of the Audit Committee is authorized to review and, where consistent with this policy, to pre-approve non-audit services proposed to be performed by the independent auditors that are budgeted for fees of $25,000 or less. The Chairman shall report any pre-approval decisions to the Audit Committee as soon as practicable and in any event at its next scheduled meeting.

## Presence at Annual Meeting

A representative of PricewaterhouseCoopers will be present at the Annual Meeting. The representative will be given an opportunity to make a statement if he or she desires to do so and will be available to answer appropriate questions from stockholders.

38

## COMPARISON OF TOTAL STOCKHOLDER RETURN

### Comparison of 5 Year Cumulative Total Return
Assumes Initial Investment of $100
December 2004



The graph plots cumulative total return on a $100 investment in the Company's Common Stock for the past five years. The S&P 500 Index and group of peer issuers are shown for comparison and include reinvestment of dividends where applicable. The peer issuers were selected because of the similarity of business elements and contracts held with the U.S. Department of Energy. These peer issuers include the following five companies: Flour Corporation, Jacobs Engineering Group, Inc., The Shaw Group, Inc., TRC Companies, Inc. and Washington Group International, Inc.

### Cumulative Total Return

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Kaiser Group Holdings, Inc. * | $ 4.00 | $ 8.61 | $ 14.58 | $ 59.72 | $ 73.61 |
| S&P 500 | $ 0.90 | $ 80.10 | $ 62.39 | $ 80.29 | $ 89.02 |
| Peer Issuers Only | $ 113.16 | $ 110.68 | $ 90.79 | $ 127.22 | $ 153.31 |
| Peer Issuers plus Kaiser Group Holdings, Inc. | $ 112.98 | $ 110.50 | $ 90.72 | $ 127.50 | $ 153.67 |

*Prior to December 18, 2000, the financial performance is that of International

39

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

The Commission requires public companies to tell their shareholders when certain persons fail to report their transactions in the company's equity securities to the Commission on a timely basis. Based upon a review of Commission Forms 3, 4, and 5 furnished to the Company, and based on representations that no Forms 3, 4, and 5 other than those already filed were required to be filed, the Company believes that all Section 16(a) filing requirements applicable to officers, directors and beneficial owners of more than 10% of the equity securities of Kaiser Holdings were satisfied with respect to the year ended December 31, 2004 except that, due to the expiration of the Commission electronic access codes and the delay in obtaining the new codes, a Form 4 reporting the purchase of 1,000 shares of common stock by Mr. Williams was filed four weeks late by his accountant. A Form 4 reporting the sale of 500 shares of Common Stock was also filed late for Mr. Bennett due to the Company not being notified of the transaction.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

At December 31, 2004 and 2003, the Company had invested funds in certificates of deposit at Capital Bank, a financial institution where one of the Company's directors serves on the board. The certificates of deposits total $2.0 million and $1.0 million at December 31, 2004 and 2003, respectively. The certificates of deposit bear a market rate of interest.

During the years ended December 31, 2004, 2003 and 2002, the Company paid $281,000, $474,000 and $862,000, respectively, in legal fees to Squire, Sanders & Dempsey L.L.P., a law firm for which one of the Company's directors was a partner. Effective February, 2005, this individual no longer serves as a director of the Company.

## OTHER MATTERS

The 2006 Annual Meeting of Stockholders of the Company has not yet been scheduled, but it is presently expected to be held during May or June 2006.

### Communications with the Board of Directors; Board Attendance at Annual Meeting

The Company does not have a formal process for security holders to send communications to the Board. However, communications addressed to the Company's Board of Directors as a whole, or to individual directors, in care of the Company at the Company's executive offices in Fairfax, Virginia will be forwarded promptly to the addressee(s) of such communications.

The Company does not have a policy with respect to Board members' attendance at the Annual Meeting. However, the Company's practice is to hold a meeting of the Board of Directors immediately following the Annual Meeting, and Board members typically attend the Annual Meeting as well. All members of the Board of Directors were present at the 2004 Annual Meeting.

40

**Corporate Governance Principles and Code of Conduct**

The Company's Board of Directors has adopted Corporate Governance Principles for the Board of Directors and a Corporate Code of Conduct, including Policies on Securities Law Compliance and Transactions in Company Securities. The Code of Conduct applies to all employees, officers and directors and includes, but is not limited to, the substance of the code of ethics required by applicable Commission rules. Copies of these documents were filed as Exhibits to a Current Report on Form 8-K filed with the Commission on January 13, 2004.

**Stockholder Proposals and Other Business .**

Stockholders interested in submitting a proposal for inclusion in the proxy materials for the 2006 Annual Meeting of Stockholders may do so by following the procedures prescribed in Commission Rule 14a-8 and Section 1.4 of the Company's Bylaws. To be properly brought before a meeting of stockholders, business must be (a) specified in the notice of the meeting given by or at the direction of the Board of Directors, (b) otherwise properly brought before the meeting by or at the direction of the Board of Directors, or (c) otherwise properly brought before the meeting by a stockholder. In addition to the requirements of Commission Rule 14a-8, for business to be properly brought before a meeting of stockholders by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the Company. To be timely, such notice must be received at the Company's principal executive offices, 9300 Lee Highway, Fairfax, Virginia 22031, not less than 60 days nor more than 90 days prior to the meeting. In the event that less than 75 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, to be timely notice must be received by the Company not later than the close of business on the fifteenth day following the date on which such notice of the date of the meeting was mailed or such public disclosure was made, whichever first occurs. A stockholder's notice with respect to other business to be brought before the 2006 Annual Meeting by such stockholder must set forth as to each matter of business:

(a)   a brief description of such business and the reasons for conducting it at the meeting,
(b)   the name and address of the stockholder proposing such business,
(c)   the class, series, and number of shares of the capital stock of the Company beneficially owned by such stockholder, and
(d)   any material interest of such stockholder in such business.

**Incorporation by Reference**

In the Company's filings with the Commission, information is sometimes incorporated by reference. This means that the Company is referring you to information that it has filed separately with the Commission. The information incorporated by reference should be considered part of this Proxy Statement, except for any information superseded by information contained directly in this Proxy Statement.

This Proxy Statement incorporates by reference the following documents that the Company has previously filed with the Commission. They contain important information about the Company and its financial condition.

- Annual Report on Form 10-K for the year ended December 31, 2004;

- Current Reports on Form 8-K dated February 17, 2005, February 28, 2005 and April 7, 2005.

41

The Company also incorporates by reference any additional documents that the Company may file with the Securities and Exchange Commission under Section 13(a), 13(c), 14 or 15(d) of the 1934 Act between the date of this Proxy Statement and the date of the Annual Meeting.

The Company will provide, without charge, to each person to whom this Proxy Statement is delivered, upon written request of such person, a copy of any and all information that has been incorporated by reference, without exhibits unless such exhibits are also incorporated by reference in this Proxy Statement. You may obtain a copy of these documents and any amendments thereto by writing to Douglas W. McMinn, President and Chief Executive Officer, at the following address: Kaiser Group Holdings, Inc., 9300 Lee Highway, Fairfax, Virginia 22031.

These documents are also included in the Company's filings with the Securities and Exchange Commission, which you can access electronically at the SEC's website at http://www.sec.gov.

**Where You Can Find More Information**

The Reverse Split will result in a "going private" transaction subject to Rule 13e-3 of the Exchange Act. The Company has filed a Rule 13e-3 Transaction Statement on Schedule 13E-3 under the Exchange Act with respect to the Reverse Split. The Schedule 13E-3 contains additional information about the Company. Copies of the Schedule 13E-3 are available for inspection and copying at the principal executive offices of the Company during regular business hours by any interested stockholder of the Company, or a representative who has been so designated in writing, and may be inspected and copied, or obtained by mail, by written request directed to Douglas W. McMinn, President and Chief Executive Officer, at the following address: Kaiser Group Holdings, Inc., 9300 Lee Highway, Fairfax, Virginia 22031.

The Company is currently subject to the information requirements of the Exchange Act and files periodic reports, proxy statements and other information with the Commission relating to its business, financial and other matters.

Copies of such reports, proxy statements and other information, as well as the Schedule 13E-3, may be copied (at prescribed rates) at the public reference facilities maintained by the Commission at Room 1024, 450 Fifth Street, N.W., Judiciary Plaza, Washington, D.C. 20549. For further information concerning the Commission's public reference rooms, you may call the Commission at 1-800-SEC-0330. Some of this information may also be accessed on the World Wide Web through the Commission's Internet address at http://www.sec.gov.

By Order of the Board of Directors.

/s/ Nicholas Burakow

Nicholas Burakow, PhD
Secretary

Fairfax, Virginia
[          ], 2005

42

**APPENDIX A**

### CERTIFICATE OF AMENDMENT
### TO CERTIFICATE OF INCORPORATION OF
### KAISER GROUP HOLDINGS, INC.

Kaiser Group Holdings, Inc. (the "Corporation"), a corporation organized and existing under and by virtue of Delaware General Corporation Law, DOES HEREBY CERTIFY:

**FIRST** : That the Corporation's Certificate of Incorporation be, and hereby is, amended by inserting the following at the beginning of Article FOURTH:

Effective the close of business on [          ], 2005 (the "Effective Time") each one (1) share of Common Stock of the Corporation issued and outstanding immediately prior to the Effective Time ("Old Common Stock") shall automatically be combined, without any action on the part of the holder thereof, into one-twentieth (1/20 th) of one (1) share of fully paid and nonassessable Common Stock of the Corporation ("New Common Stock"), subject to the treatment of fractional share interests described below.

Following the Effective Time, each holder of Old Common Stock shall be entitled to receive upon surrender of such holder's certificate(s) representing Old Common Stock (whether one or more, "Old Certificates") for cancellation pursuant to procedures adopted by the Corporation, a book entry (direct registration) or a certificate(s) representing the number of whole shares of New Common Stock (whether one or more, "New Certificates") into which and for which the shares of Old Common Stock formerly represented by such Old Certificates so surrendered are reclassified under the terms hereof. From and after the Effective Time, Old Certificates shall represent only the right to receive a book entry (direct registration) representing the New Common Stock or New Certificates and, where applicable, cash in lieu of fractional shares, as provided below.

No fractional shares of Common Stock of the Corporation shall be issued. No stockholder of the Corporation shall transfer any fractional shares of Common Stock of the Corporation. The Corporation shall not recognize on its stock record books any purported transfer of any fractional share of Common Stock of the Corporation. A holder of Old Certificates at the Effective Time who would otherwise be entitled to a fraction of a share of New Common Stock shall, in lieu thereof, be entitled to receive a cash payment in an amount equal to the fraction to which the stockholder would otherwise be entitled multiplied by $585.00.

**SECOND** : That the Board of Directors of the Corporation approved the foregoing amendment at a meeting of the Board and directed that such amendment be submitted to the stockholders of the Corporation entitled to vote thereon for their consideration, approval and adoption thereof.

**THIRD** : That the stockholders of the Corporation entitled to vote thereon approved the foregoing amendment in accordance with the provisions of Section 242 of the Delaware General Corporation Law.

A-1

    **IN WITNESS WHEREOF,** the undersigned, being the Secretary of the Corporation, for the purpose of amending the Certificate of Incorporation in accordance with the applicable provisions of the Delaware General Corporation Law, under penalties of perjury does hereby declare and certify that this is the act and deed of the Corporation and that the facts stated herein are true, and accordingly has hereunto signed this Certificate of Amendment to Certificate of Incorporation as of [        ], 2005.

KAISER GROUP HOLDINGS, INC.

By: _____
       Nicholas Burakow, Secretary

A-2

**APPENDIX B**

Proxy Solicited on Behalf of the Board of Directors of the Company for the
Annual Meeting of Stockholders on [        ], [        ], 2005

**P**
**R**  The undersigned hereby constitutes and appoints Jon B. Bennett and Frank E. Williams, Jr. and each of them, his true
**O**  and lawful agents and proxies with full powers of substitution in each, to represent the undersigned at the Annual
**X**  Meeting of Stockholders of KAISER GROUP HOLDINGS, INC., 9302 Lee Highway, Fairfax, Virginia on [        ],
**Y**  [        ], 2005, at 10:30 a.m., and at any adjournments thereof, on all matters coming before said meeting.

This Proxy, when properly executed, will be voted in the manner directed by the Stockholder. If no direction is
given, this Proxy will be voted FOR item 1, approval of the amendment to the certificate of incorporation and
FOR all of the nominees listed in item 2.

☒   Please mark your votes as in this example

|   |   | FOR | AGAINST | ABSTAIN |
|---|---|---|---|---|
| 1. | APPROVAL OF THE AMENDMENT TO THE CERTIFICATE OF INCORPORATION TO EFFECTUATE A ONE FOR 20 REVERSE STOCK SPLIT. | ☐ | ☐ | ☐ |

**The Board of Directors recommends a vote FOR the election of each director .**

|   |   | FOR all nominees (except as marked to the contrary) | WITHHELD AUTHORITY to vote for all nominees |   |
|---|---|---|---|---|
| 2. | ELECTION OF DIRECTORS | ☐ | ☐ | Jon B. Bennett<br>Douglas W. McMinn<br>Mark S. Tennenbaum and<br>Frank E. Williams, Jr. |

(Instruction: If you wish to withhold authority to vote for any individual nominee, line through the nominee's name listed above.)

**NOTE:**   Please sign the full name in which your stock is registered. Joint owners must sign. When signing as attorney,
executor, administrator, trustee or guardian, please give full title as such.

The signer hereby revokes all proxies heretofore given by the signer to vote at said meeting or any adjournments thereof.

_____

_____
SIGNATURE(S)                DATE

B-1

**End of Filing**

Powered By EDGAR
Online

Case 1:05-cv-00384-JJF     Document 4-9     Filed 06/10/2005     Page 24 of 26

© 2005 | EDGAR Online, Inc.

# EXHIBIT   B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| KAISER GROUP INTERNATIONAL, INC., et al. | ) Case Nos. 00-2263 to 00-2301 (MFW) |
| | ) |
| | ) (Jointly Administered Under |
| | ) Case No. 00-2263 (MFW)) |
| Debtors | ) |
| | ) Objection Deadline: May 19, 2005 at 4:00 PM |
| | ) Hearing Date: May 26, 2005 at 2:00 PM |

## DECLARATION OF CRAIG J. McCANN, Ph.D., CFA, IN SUPPORT OF MOTION OF CLAIMANT PIPPIN AND THE CLASS OF ICT SPECTRUM CLAIMANTS FOR A STAY OF THE DE-REGISTRATION OF KAISER GROUP HOLDINGS COMMON STOCK PENDING THE FINAL DISPOSITION OF THE BANKRUPTCY COURT'S FEBRUARY 2, 2004 ORDER

I, Craig J. McCann, hereby declare, under penalty of perjury, as follows:

1.     I am President of Securities Litigation and Consulting Group, Inc., and am experienced in securities class action litigation, financial analysis, investment management, and valuation disputes. I have taught graduate investment management at Georgetown University and at the University of Maryland, College Park.

2.     Prior to founding Securities Litigation and Consulting Group, I was Director at LECG and Managing Director, Securities Litigation at KPMG. I also was a senior financial economist at the Securities and Exchange Commission, where I focused on investment management issues and contributed financial analysis to numerous investigations involving alleged insider trading, securities fraud, personal trading abuses and broker-dealer misconduct.