# EXHIBIT  H

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
KAISER GROUP INTERNATIONAL          .    Case No. 00-2263(MFW)
INC., et al.,                       .    Jointly Administered
                                    .
           Debtors.                 .    May 31, 2005
                                    .    2:00 p.m.
                                    .    (Wilmington)


                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MARY F. WALRATH
        UNITED STATES BANKRUPTCY COURT JUDGE


















        Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.



THE CLERK: All rise. You may be seated.

THE COURT: Good afternoon.

MR. MINUTI: Good afternoon, Your Honor. Mark Minuti from Saul Ewing. I'm here today with Christopher Meyer of the Squire, Sanders, and Dempsy firm representing Kaiser Group International, Inc. Your Honor, there's only one item going forward on the agenda today. That's the motion of the Pippin claimant and the class of ICT Spectrum claimants for a stay. At the outset, I did want to thank Your Honor for accommodating our schedules and having this special hearing today. Because it is the class's motion, I'll turn the podium over to them.

THE COURT: Thank you.

MR. MINUTI: Thank you.

MR. NAYLOR: Good afternoon, Your Honor. Zack Naylor, Chimicles and Tikellis, local counsel to the claimants here. I have seated with me at counsel table, William Kane of the firm Miller, Faucher, and Cafferty. I've previously moved his admission *pro hac vice*, Your Honor has not granted that order yet. If Your Honor is so inclined, I have a copy of the form of order with me today.

THE COURT: I will grant it. I'm sure it will come through in the ordinary course. Thank you.

MR. NAYLOR: Thank you, Your Honor. Also seated with me is Michael Tarringer, also of Miller, Faucher, and

3

1  Cafferty who I believe has appeared before Your Honor in this

2  matter before and has been previously admitted *pro hac vice.*

3        THE COURT: Okay.

4        MR. NAYLOR: We're also joined by Dr. Craig McCann

5  who's with us in the back of the room who authored the

6  declaration in support of our memorandum.

7        THE COURT: All right.

8        MR. NAYLOR: And if it suits Your Honor, Mr. Kane

9  will row our boat today.

10       THE COURT: All right.  Thank you.

11       MR. NAYLOR: Thank you.

12       MR. KANE: Good afternoon, Your Honor.

13       THE COURT: Good afternoon.

14       MR. KANE: And may it please the Court, my name is

15  William Kane.  I'm a partner in the law firm of Miller,

16  Faucher, and Cafferty and along with my colleagues, I

17  represent James Pippin and the class of ICT Spectrum

18  claimants.

19       THE COURT: Yes.

20       MR. KANE: Your Honor may recall that Denny Faucher

21  from my office participated in some previous hearings

22  regarding these issues.  Mr. Faucher is essentially retired

23  now, and I have taken up this assignment.  Your Honor, quite

24  simply by way of our motion, we are attempting to preserve

25  the status quo, both under the plan and as established in

FORM FED 25  ⊕  PENGAD · 1-800-631-6995

1   this Court's stay order issued in October of 2004.  Kaiser's

2   response to our motion takes a somewhat extraordinary

3   position that this Court lacks jurisdiction to enforce its

4   own order.  Or that otherwise a new adversary proceeding

5   would be necessary to seek enforcement of the existing order.

6   Neither proposition can be supported, and we believe that

7   8005 is the correct procedural tool to use with this motion.

8   Specifically because, Your Honor, following the August 2004

9   hearing Your Honor issued an order granting a stay to the

10  Debtor, but conditioning that stay expressly on their

11  agreement to continue to set aside and hold 262,975 shares of

12  Kaiser new common stock for the benefit of the Class, pending

13  further order of this Court.  In their proxy material, that

14  they're currently soliciting Your Honor, it is obvious that

15  they no longer intend to do that.  Either in letter or in

16  spirit.  They are not going to have, and our Class claimants

17  will not have the benefit, like other Class 5 and Class 4

18  treatments under the plan, to new Kaiser common stock.  It's

19  going to be a much different, fundamentally different

20  security by the time it ends up in the hands of our Class

21  claimants.  Those fundamental changes are at the heart,

22  really, of this motion.  Because we were in before - -

23          THE COURT: Well, how are they changing it other

24  than having a reverse stock split?

25          MR. KANE: They're having a reverse stock split, a

20 for 1, Your Honor, and they're also delisting it.  The

whole purpose, they allege, behind the reverse split is to

allow them to get under 300 shareholders so that they can

delist it.  And with that - -

THE COURT: Explain to me how a reverse stock split

reduces the number of shareholders.

MR. KANE: There are two aspects to it, Your Honor.

THE COURT: If you have 350 shareholders now, you'll

have 350 after you reverse stock split.

MR. KANE: Right.  But it's their plan - - they're

going to accomplish that in a couple different ways.  One,

undoubtedly, minority shareholders who understand that this

is going to have a dramatic effect on the value of their

shares will essentially vote with their feet and sell their

shares.  But number two, they are also having a cash-out

provision, essentially.  They'll be no fractional shares.

And despite what they argued so aggressively in August of

2004, if you have a tail of 19 or fewer shares, they're going

to cash you out.  And they, themselves, have already

determined what that cash price is going to be.  And so while

they argued so effectively to Your Honor in the past that

this was not about value, that this was not about money, that

this was about a thing, essentially.  That what we were

entitled to, and what they promised to hold, and what you

ordered them to hold, was a specific amount of a specific

6

1  thing.  And that is essentially 263 thousand shares of Kaiser

2  new common stock.  They're no longer - - that's no longer

3  going to exist.

4        THE COURT: Well, wasn't that premised on a

5  percentage, not a number?

6        MR. KANE: No, Your Honor.  The order is explicit.

7        THE COURT: I know the order is explicit.  But that

8  was based on a percentage relative to others in your same

9  Class.

10        MR. KANE: That's how the number was originally

11 calculated, Your Honor.

12        THE COURT: Right.

13        MR. KANE: But there is - - there are significant

14 reasons why this new share would be particularly unfair to

15 the class of claimants.  Class 5 and the Class 4 claimants,

16 under the plan, have already had and enjoyed the shares, have

17 already been able to deal with them as they see - - as they

18 deem appropriate.  These - - our Class has not.

19        THE COURT: But isn't that a function of the plan,

20 not my prior order?  The plan said you don't get it until

21 your claim is finally allowed.

22        MR. KANE: It's a combination, Your Honor.  The plan

23 also says they're going to get - - and your order says

24 they're going to get the new Kaiser common stock.  That's

25 specifically contemplated.  It's a specific thing.  That's

1    what they argued.

2            THE COURT: Okay.

3            MR. KANE: They're now changing "the thing" in such

4    a fundamental way that it is very different from what they

5    were awarded originally.

6            THE COURT: How is it fundamentally different?  It's

7    stock.  In the company.

8            MR. KANE: It's common stock in the company, Your

9    Honor, that's going to be, that's going to be delisted.  It's

10   going to be incredibly illiquid.  There are already liquidity

11   problems with it.  This is not an issue - - if Your Honor

12   will recall that your primary focus the last time was on

13   market fluctuations that may happen as a result of any number

14   of marketplace factors.  And that the stock might go up, and

15   that the stock might go down.  But it would depend - -

16   everybody was pulling the rope in the same direction.

17   Everybody wanted the company to succeed.  What the directors

18   have now done, and in particular there are two directors that

19   hold 60% of the common shares.  What they've been able to do

20   here, is essentially separate out the fortunes of the

21   company, and how well the company is doing, from the fortunes

22   of minority shareholders.  You do that by delisting the

23   stock.  You do that so that you don't have to have the same

24   information exchange.  You're not held to the same levels of

25   accountability.  You do a reverse stock split so again it's

8

1  illiquid.

2         THE COURT: But aren't these all - - none of this,

3  though, is matters that really are within my jurisdiction,

4  though.  This is corporate governance, isn't it?  Isn't your

5  remedy to go to Chancery Court or elsewhere?

6         MR. KANE: No, Your Honor, because first of all,

7  we're stayed.  And the stay expressly conditions, it's

8  expressly conditioned upon them holding the shares for

9  distribution.

10        THE COURT: All right.

11        MR. KANE: And they're not going to do that.

12 They're going to make a fundamental change to it, which is

13 patently unfair to our Class members.  And Your Honor, you

14 have to understand, in the framework of things, they try to

15 say well, maybe we'll save a few dollars here or there by not

16 having to comply with Sarbanes-Oxley, for instance, which of

17 course was enacted specifically to shed sunlight on corporate

18 activities for the benefit of shareholders.  But the people

19 who are making those choices are really our clients'

20 opponents in this litigation.  That is, the same officers and

21 directors who are taking these actions that are, even the

22 proxy's statement admits, could result in a substantial

23 decrease in value for minority shareholders, these are the

24 majority shareholders doing this.  These are the same folks

25 who are involved in the defense of the claim, who are

1   involved in the appeals, who could someday be involved in

2   resolution or a settlement of the case.  They have every

3   motivation to devalue our clients' shares by taking actions

4   that don't hurt the company, but do hurt minority shares in

5   the company.

6           THE COURT:  But again, why is that my problem?  Why

7   is that something I have jurisdiction to decide?  This is a

8   fight of minority shareholders against the management or

9   majority shareholders.

10          MR. KANE:  Well, Your Honor, what we would request

11  is that if you don't agree with staying their activity,

12  essentially forcing them to comply with the order, that you

13  not allow them to have it both ways.  And that is, the stay

14  is conditioned on certain very specific conditions.  They're

15  no longer going to comply with those conditions in letter or

16  in spirit.  So the stay should be lifted, and we should have

17  a plan, an approved plan of distribution and execution.

18          THE COURT:  Well, my order staying it was not

19  premised simply on, you know, stay pending appeal to preserve

20  the status quo.  My stay was premised on the fact that the

21  plan wouldn't give you that stock anyway.  If I lifted the

22  stay, you don't get that stock anyway.

23          MR. KANE:  Your Honor, regardless, they have agreed

24  to a condition.  They put on - - they put in an affidavit

25  that said that they were going to hold it.

1    THE COURT: Let's assume I vacate my order staying

2  my prior order.  What effect - - they simply say we don't

3  have to give you the stock until you have a final order

4  anyway.

5    MR. KANE: Well, Your Honor, then what we would - -

6  what we say in response to that is - -

7    THE COURT: What would you do?

8    MR. KANE:  - - they're also in violation of the

9  plan.

10   THE COURT: How?

11   MR. KANE: Because the stock that our people will

12  get, ultimately, is not the stock contemplated under the

13  plan.  It's completely different.  Nobody got an opportunity

14  to vote or to object to some different creature of security

15  that they were planning that's incredibly devalued as

16  compared to the original stock contemplated under the plan.

17   THE COURT: Let's assume - -

18   MR. KANE: All the other creditors and different

19  classes have already gotten that stock.  We're the only ones.

20   THE COURT: Let's assume you get the 262 thousand

21  shares today.

22   MR. KANE: Yes, Your Honor.

23   THE COURT: They can still do exactly what they're

24  contemplating doing.

25   MR. KANE: Your Honor, if we got them today at least

1   the class members would have some time to try to deal with

2   the coming reality. I mean, make no mistake about it, we

3   understand what's going to happen. Two of the directors hold

4   60% of the shares. And - -

5       THE COURT: You're asking me to change the plan in

6   order for them to give you the stock today.

7       MR. KANE: They're the ones who are violating the

8   plan, Your Honor, by changing the stock.

9       THE COURT: The plan - -

10      MR. KANE: That's what we're entitled to under the

11  plan.

12      THE COURT: The plan did not state that they can

13  never have a reverse stock split. The plan did not

14  contemplate that this Court would ever be involved in

15  corporate governance matters.

16      MR. KANE: Your Honor, but we're asking that you

17  enforce the order that was issued. With the condition in it

18  that they agreed to. And that was part of the order. That's

19  what they said they were going to do. That's when they were

20  saying they shouldn't have to post a bond, they should come

21  in and get the benefit of a Court ordered stay. Whether

22  consistent with the plan or otherwise, they agreed that it

23  would be conditioned, and Your Honor did so condition it.

24  They now want to have the benefit of the stay remain while

25  they change the fundamental, the fundamental nature of the

1    security at issue.

2    THE COURT: But the plan allows them to change the

3    fundamental nature of the security, does it not?

4    MR. KANE: I don't think that it addresses it one

5    way or the other, Your Honor.

6    THE COURT: It doesn't preclude them from having a

7    reverse stock split.

8    MR. KANE: It doesn't preclude them from doing a lot

9    of things, Your Honor.  I mean I - -

10    THE COURT: Right.  Then - - but you're asking - -

11    MR. KANE:  - - I wouldn't expect it to be explicit

12    in there.

13    THE COURT: You're asking me to preclude them from

14    doing that.

15    MR. KANE: I'm asking you to ensure that our Class 5

16    claimants are treated like all other Class 5 claimants, and

17    Class 4 claimants, for that matter.

18    THE COURT: You are.  Nobody got their stock until

19    their claim was allowed.

20    MR. KANE: But they all got new Kaiser common stock

21    - -

22    THE COURT: And you will too.

23    MR. KANE: - - with certain traits to it that are

24    much more desirable than the traits that they're about to

25    impose.

1    THE COURT: But what they're about to do has nothing

2   to do with the plan. And it's not prohibited by the plan.

3   So, I'm giving you something more than others got.

4    MR. KANE: Something more, Your Honor?

5    THE COURT: If I enter the order that you want, I'm

6   giving you something more than others got.

7    MR. KANE: No, Your Honor. We'd get exactly the

8   same. Because we wouldn't have delisted, devalued shares.

9    THE COURT: No. They're going to get delisted,

10  devalued shares, and you're not going to. You're getting

11  something better than others.

12    MR. KANE: No, Your Honor. No - - we're the only

13  ones left. We're the only ones left. Everyone else - -

14    THE COURT: Well, some people have stock. Some

15  people already got the stock.

16    MR. KANE: Right. Class 5 claimants, Class 4

17  claimants. We're a Class 5 claimant. Everyone who was taken

18  care of through Class 5 was given the stock that was

19  contemplated under the plan. We know what it was. We don't

20  have to guess what the nature of that - - we don't have to

21  guess what the nature of that is. We know what it is. They

22  issued it to them.

23    THE COURT: Yes.

24    MR. KANE: We're going to get something

25  fundamentally different from that, and something

1   fundamentally less valuable.

2           THE COURT: Do you want me to stop the delisting

3   completely?  So everybody - -

4           MR. KANE: Your Honor - -

5           THE COURT:  - - keeps their common stock?  Or do

6   you want me only to do it as to you?

7           MR. KANE: We recognize that you can't do it just as

8   to one.

9           THE COURT: Okay.

10          MR. KANE: What we're saying is they shouldn't be

11  able to have it both ways.  The stay was conditioned.  They

12  can either satisfy the condition, or the stay should be

13  lifted.

14          THE COURT: All right.

15          MR. KANE: Your Honor, attached to our papers was an

16  affidavit, or declaration I should say, from Dr. McCann who

17  is here in the courtroom.  We're happy to rest on the

18  declaration.  If you have any questions for him, or you would

19  like - -

20          THE COURT: Well, I haven't considered it.  Is there

21  any objection to my considering it?

22          MR. MEYER: Your Honor, as indicated in our

23  response, we did not believe that either the procedural

24  posture or the jurisdiction existed for the Court to consider

25  the motion on the merits today.  We did mention in the

1   response that had this been commenced as an adversary

2   proceeding for an injunction, we would have had the ability

3   and the time to respond and depose counsel's witness.  The

4   declaration is submitted.  If the Court wishes to rule on the

5   substance of the matters set forth in the declaration, we

6   would expect to be able to depose the witness before that

7   evidence comes in.

8           THE COURT: Well, I'm not sure - -

9           MR. MEYER: Do you wish me to - -

10          THE COURT: I'm not sure, in a PI, preliminary

11  injunction hearing you'd have the opportunity to depose the

12  witness before the hearing.

13          MR. MEYER: I might not in a - -

14          THE COURT: And the witness is here today.

15          MR. MEYER:  - - preliminary injunction hearing, but

16  we're here on a motion.  And as we - -

17          THE COURT: A motion for an injunction.

18          MR. MEYER: A motion for an injunction that connects

19  in no way to an adversary proceeding under RuJe 7001.  So

20  it's a freestanding motion.  We advised counsel that we would

21  object to the process as well as to the substance of the

22  motion, and suggested that they do it as an adversary if they

23  wished to do it.  But they elected to proceed on the motion.

24          THE COURT: Well, what if I consider it as a motion

25  to modify my stay order?

1      MR. MEYER: I think Your Honor answered that

2  question yourself.  Mr. Kane was not here when we were here

3  last summer talking about the stay.  And there was a colloquy

4  between you and I about was a stay needed, and between you

5  and Mr. Tarringer also, and we said we didn't honestly think

6  so.  We thought the plan did it, but to the extent that a

7  stay was necessary, we asked that you provide it.  And that's

8  the way the ruling came out.  I think your view then, as now,

9  was that the plan's terms do not require issuance of plan

10  consideration on a disputed claim.  Now, in that respect,

11  they're not the only one who's left.  There are other

12  disputed claims left for whom the parties have not received

13  their plan consideration.  If they are victorious, they will,

14  if they're not, they won't.  But the plan provides that those

15  disputes have to be resolved before the value is issued.  So

16  with or without a stay, we believe that remains true, and we

17  don't believe they would be entitled to the issuance of

18  shares, even if Your Honor vacated the portion of your order

19  that said that you were staying proceedings.  Had you

20  finished?  I'm sorry, I didn't - -

21      MR. KANE: Yes, Your Honor.  Unless you had any

22  further questions.  Just on the procedural issue, just

23  briefly, Your Honor.  We do think that 8005 is the correct

24  procedural mechanism because it's adjunct specifically to the

25  order that was previously issued as a result of an 8005

proceeding that they brought. Now, you know, there's nothing

new here. In terms of deposing Dr. McCann, they knew about

Dr. McCann for weeks. They haven't asked for a deposition of

Dr. McCann. They brought - - they have no competing

declaration. The proxy statement, when Your Honor - - if

Your Honor has an opportunity to look for it, it's full of

red flags demonstrating admissions left and right that this

is going to be very bad for the minority shareholders. Dr.

McCann is essentially only confirming what Kaiser's own proxy

statement demonstrates. But they haven't put in a competing

declaration from an expert, or from any executive of the

company explaining why they're doing this, what they hope to

be the benefits, at least over the long term. The money that

they hope to save on reporting seems a pittance as compared

to the amount that the shareholders are going to lose as

result of the devaluation of these stock - - this stock

issuance. Thank you, Your Honor.

MR. MEYER: I'm sorry, Your Honor. You had asked me

a question, I wanted to respond and then to allow Mr. Kane to

finish.

THE COURT: All right. Let me hear your position on

this.

MR. MEYER: Your Honor, this is essentially a

corporate governance transaction. Nowhere in the plan is

there any limitation on the ability of the corporation, the

1  reorganized company to engage in a variety of corporate
2  transactions that would involve consideration by management,
3  by the board, or by the shareholders.  The transaction in
4  question is a transaction that is subject, under Delaware
5  law, to a vote by shareholders.  To the extent that the ICT
6  claimants have received shares, and some of them have, as the
7  holders of shares at the time of the plan, they have an
8  opportunity to vote on that proceeding just like anybody else
9  does.  There is nothing inherent in that transaction that
10  changes the proportional rights of any party in reorganized
11  Kaiser.  What is simply says is what is heretofore
12  represented by 20 shares will be represented by 1.  So I
13  would agree with Mr. Kane that it will have the effect of
14  reducing the number of shareholders, because those with less
15  than 20 shares, and I don't know how many there are, but
16  those with less than 20 shares, under the formula, would
17  receive a fraction.  There is a proposed cash payment in lieu
18  of a fractional share, and shareholders are given, under
19  Delaware law, a right to valuation if they dispute the amount
20  that's awarded them pursuant to the cashout portion of that
21  transaction.  We continue to - - and in fact the proxy
22  materials explicitly acknowledge and protect the rights of
23  the ICT claimants to receive the same proportion of shares of
24  the reorganized company, if they are successful in their
25  appeal, that would give them a right to approximately 13% of

the reorganized company.  Whether that is represented by 240
thousand shares or 20 thousand shares, it's the same
proportionate interest.  Now what they have asked the Court
to do, under Rule 2005, is not to stay any proceeding in this
Court.  In fact, they've not asked you to stay any proceeding
in any Court.  What they've asked you to do is enjoin Kaiser
from proceeding with a transaction that is permitted under
Delaware corporate law.  And our view was first, that that is
seeking an injunction.  It isn't a question of an 8005 stay,
because the stay of 8005 deals with the proceedings in the
court pending disposition of an appealed order.  And we were
here last summer on 8005, and argued out what it did and did
not do, and whether it was or was not necessary.  But what's
requested here is something really quite different.  It's an
affirmative injunction against a party from proceeding with a
transaction.  So it applies to the reorganized company, and
applies implicitly to its Board of Directors, management, and
shareholders.  We believe that the only way to request that
relief is in an adversary proceeding commenced under Rule
7001 with all the trappings that would be inherent in that
proceeding.  More fundamentally, we don't believe that the
relief requested is within the subject matter jurisdiction of
the Court.  Section 1334 and Section 157 provide the basis
for all of the rest of the bankruptcy substantive provisions.
And they deal with proceedings that arise in or relate to a

1   case before Your Honor.  And in this instance, the relief

2   requested does not come within the ambit of those sections.

3   What they're asking for is to enjoin a corporate governance

4   transaction.  Now, they disagree with the desirability of

5   that transaction and believe, we grant in good faith, that it

6   may have an impact on the value of their shares.  We don't

7   necessarily agree with that conclusion, but we're not

8   challenging their right to have the view of it.  They're

9   asking that the transaction be enjoined, effectively

10  disenfranchising all of the shareholders of the reorganized

11  company, and telling them that although Delaware law gives

12  them a right to vote that because this group disagrees with

13  the desirability of the transaction, there should be no vote

14  conducted, and instead they should be prevented from

15  considering that issue.  We don't think that that relates in

16  any way to our plan or to this case.  It is simply a matter

17  of a disagreement as to the desirability of a corporate

18  transaction, and I agree with Your Honor's comment, there may

19  be courtrooms in which they can bring their claim, we don't

20  believe that this is appropriately one of them.  There is a

21  limit to Bankruptcy Court jurisdiction, particularly on a

22  post-confirmation basis.  Third Circuit law, cited in our

23  response, says that there needs to be a connection, or nexus,

24  to the plan, and that they should not seek, under the guise

25  of a stay - - or under the guise of a proceeding before the

1  Court, to have the Court modify the plan as opposed to

2  enforcing it.  Both of those two issues are involved here.

3  The plan has been confirmed and substantially consummated.

4  They have rights under the plan that we have discussed at

5  prior hearings.  Those rights are when the appeal is

6  resolved, if they are successful they will receive shares

7  representing approximately 13% of the company.  At the moment

8  we're holding - - holding is something of a misnomer, and

9  it's hard to hold unissued shares.  But there are shares

10 there to issue that represent that amount of proportionate

11 interest.  The same will be true whether or not the proposed

12 transaction is approved.  Your Honor, Mr. Tarringer last

13 August was arguing with the Court that there could be a rise

14 or fall in the value of the stock, and Your Honor ruled, I

15 thought, pretty directly.  That nothing in the plan assures

16 to a shareholder that something cannot or will not happen

17 that would affect the value of those shares.  That there's no

18 assurance in the plan as to the value of the shares issued

19 under the plan.  That's the issue that we're dealing with

20 again today.  They believe that the transaction contemplated

21 may have an effect on their perception of the value of their

22 shares, and they would like Your Honor to substitute their

23 judgment, through an order, for the judgment of the

24 shareholders of the company through Delaware corporate law

25 process.  We don't believe there's jurisdiction to do that,

1  we don't believe the procedure that they have used is

2  appropriate to that outcome.  We would ask the Court to deny

3  the motion for both - - on both bases, and in fact, because

4  - - if it's denied only on a process sense, we may be back in

5  an adversary context having the same argument in three or

6  four weeks.

7       THE COURT: Well, let me ask if I can grant the

8  relief if I consider the motion as a motion to modify my

9  prior stay order granted at your request?

10      MR. MEYER: If Your Honor is considering eliminating

11 the stay that you granted, I think you can.  I mean, that's

12 certainly something the Court did, and something the Court

13 could undo.

14      THE COURT: Or modify it.

15      MR. MEYER: Well, I suppose it would depend on the

16 matter in which it was modified.

17      THE COURT: Well, what if I modified it to require

18 that you put the cash value, the current market value, of

19 those stocks in escrow or obtain a bond in that amount?

20      MR. MEYER: Your Honor, I think that would amount to

21 a modification of the plan, and that would be beyond the

22 Court's jurisdiction notwithstanding a pending appeal.

23      THE COURT: Well, is it - - is it beyond my power in

24 issuing a stay pending appeal?  To require that the value of

25 the stock as of that time be preserved?  Or that the Debtor

1    issue a bond – –

2    MR. MEYER: When the plan doesn't do that?  Yes.  I

3    mean what – – preserving the status quo pending appeal is

4    preserving the right to the party to the relief that they're

5    seeking.  Here the relief provided by the plan – –

6    THE COURT: Well, quite frankly, the relief provided

7    by the plan didn't contemplate that they'd get a reverse

8    stock split either.

9    MR. MEYER: No it didn't.  Well, and it didn't

10   contemplate that Kaiser may enter into a new contract with

11   somebody that has an effect on the value of the shares, or

12   may experience, you know, a catastrophic loss that has a

13   value on the shares.  I mean, there's a number of things that

14   the plan doesn't adjust for.  I don't think it is a necessary

15   adjustment.  The plan says that everyone receives

16   proportional treatment.  That's the essence of Bankruptcy

17   Code treatment on claims.  And proportional means

18   proportional interest.

19   THE COURT: What is the status of the appeal?

20   MR. MEYER: The status of the appeal.  It's been

21   briefed before the District Court and is awaiting ruling,

22   Your Honor.  There was a request made for an oral argument,

23   no response to that request as yet.

24   THE COURT: All right.

25   MR. MEYER: Thank you, Your Honor.

1         MR. KANE: Your Honor, if I may respond just

2 briefly.  Mr. Meyer made reference to the hearing that Your

3 Honor conducted in August of 2004 when Kaiser came in seeking

4 the stay that's now - - that we're now operating under.  And

5 during that argument, at page 6 of the transcript, Mr. Meyer

6 himself argued that Rule 8005 of the Federal Bankruptcy Rules

7 gives the Court substantial jurisdiction to condition or stay

8 its orders or judgments pending appeal.  The thrust of that

9 discretion is to permit the Court to balance the rights of

10 the parties in interest in order to appropriately protect

11 their respective rights.  Your Honor, that's all we're asking

12 for here.  Mr. Meyer made reference to well, what happened if

13 a deal went bad or there was a catastrophic event?  That's

14 not why we're here.  We're here not based on market

15 conditions and market fluctuations.  Your Honor already

16 addressed that the last time.  This is deliberate action

17 taken by majority shareholders that has the direct and

18 immediate effect of devaluing the minority shares.  Much

19 different than some normal market condition or business

20 condition.

21         THE COURT: Well, not necessarily.  What if

22 management entered into a merger deal that turned out to be

23 catastrophic?  That would adversely affect the minority stock

24 holdings.

25         MR. KANE: Your Honor, but that's because it turns

1   out that way.  It isn't directed to be that way.  That isn't

2   the natural consequence.  That goes back to me saying

3   everybody's pulling the rope in the same direction.  And as

4   long as that's true, the minority shareholders and the

5   majority shareholders both see increases in value.  But when

6   the majority shareholders are taking action that deliberately

7   is aimed at minority shareholders and actually serves to just

8   devalue the minority, you have a totally different

9   circumstance.

10          THE COURT: Yeah.  And isn't that something you deal

11  with in Chancery Court or other appropriate venues?  Not

12  here.

13          MR. KANE: Your Honor, this is the only forum we

14  have.  We don't have the shares yet.

15          THE COURT: Well you have - -

16          MR. KANE: This is the only place - -

17          THE COURT: You have some shares.  Weren't some

18  issued?

19          MR. KANE: There were - -

20          THE COURT: Not the contested amount.

21          MR. KANE: There were very few that have nothing to

22  do with the contested amount.

23          THE COURT: Yeah.  I know.  But you are

24  shareholders.  You're minority shareholders.

25          MR. KANE: No, Your Honor.  Mr. Tarringer can speak

FORM FED-25 ® PENGAD · 1-800-631-6989

1    to that.  I think there was only one or two of the Class

2    members who were involved in that.

3             MR. TARRINGER: No.  I think that Your Honor - -

4             THE COURT: You have to talk into a microphone.

5             MR. TARRINGER: I apologize, Your Honor.  Your

6    Honor, way back when we did file a motion for distribution of

7    shares that we considered were not in dispute.

8             THE COURT: Right.

9             MR. TARRINGER: We - - that motion was denied by

10   Your Honor based on how equity interest is defined under the

11   plan.  It wraps up both disputed and undisputed shares.  So

12   they - - we wanted those 15,625 shares to be distributed so

13   our people could do something with them, because they were

14   supposed to get them no matter how this turns out.  That

15   couldn't happen because of the way the plan defines equity

16   interest.  It wraps them both up into one.  So we have - -

17   our hands are tied with regard to both those shares and the

18   247,350 additional ones that Your Honor ordered through the

19   motion for resolution of the Class...

20            MR. KANE: And so the very real reality of it is,

21   Your Honor, they've come in, they've asked for a stay,

22   they've said - - and they convinced Your Honor that a bond

23   wouldn't be required because of issues like regular business

24   conditions and market fluctuations.  That's why we're here

25   today, Because this is not a simple market fluctuation.  It

1    isn't a normal business condition.  This is actually putting

2    our class at the hands of the majority, who can essentially

3    divorce the value of the company from the value of the

4    minority shares.  That's what they can effectively do as a

5    result of this.  They can also delist.  And so that the

6    information that's available to our Class members, if and

7    when they eventually get the shares, will be much more

8    limited.  So it's a very drastic step, and it's very damaging

9    to the minority shareholders.  That's not speculative.  They

10   admit it in the proxy materials.  I think the other, the

11   other comment that's worth note is Mr. Meyer addressed the

12   cashout.  They went ahead and just valued the shares.  That's

13   what they said nobody should do, and that they couldn't do.

14   Well, they did it.  And so any fractional shares, or anybody

15   with amounts of shares that are less than 20, will be cashed

16   out of the company.  At a value that they determined based on

17   the pink sheets.

18              THE COURT: Um-hum.

19              MR. KANE: So, Your Honor, we're here because this

20   is the only place we can be.  And the type of resolution that

21   you suggested, you know, we would certainly endorse in order

22   to essentially preserve the status quo, and not have the

23   Class members essentially at the whim or at the mercy of the

24   majority shareholders while this appeal is winding its way

25   through.  Thank you, Your Honor.

1    MR. MEYER: One last point, briefly, Your Honor.

2 Counsel proceeds on the assumption that this is necessarily a

3 bad thing for the corporation.  That's simply not the fact

4 despite how many times he says it.

5    THE COURT: Well, they're not assuming it's bad for

6 the corporation, they're assuming it's bad for them.

7    MR. MEYER: Yes.  And bad for a minority

8 shareholder.  The proxy statement sets forth, in laborious

9 detail, all of the pluses and minuses.  What counsel refers

10 to as an admission is an effort on behalf of Kaiser to

11 disclose both the positives and the negatives.  The potential

12 risk, potential opportunities.  It is the belief of the Board

13 of Directors, who owe a duty to shareholders as a whole, that

14 it is a desirable transaction because it will allow the

15 corporation to operate in a more efficient manner, and will

16 reduce the ongoing compliance cost that the corporation has

17 experienced.  That's a judgment which they made not for one

18 or two shareholders, but for the shareholders as a group.

19 Now, they're entitled to a different view, and the proxy does

20 attempt to disclose completely all of the risks and

21 opportunities, and to do so in order to allow the

22 shareholders to vote as they think desirable.  But to take it

23 as an admission that this will be negative to the minority

24 shareholders is not something with which we agree.  This

25 company has traded thinly in the pink sheets previously, it

1    will continue to trade in the pink sheets. There's going to

2    be no change in that. The question is, you know, whether

3    there's going to be any effect at all on the stock value, I

4    think is anybody's guess. Your Honor, during the entire time

5    that they have expressed concern over the stock value, it's

6    been rising. And since we were here last summer, it's up

7    again. So the problems that they were concerned about, they

8    now, if they win the appeal, will get shares having a greater

9    current market value than the one they had last August. So

10   we have heard a great deal of talk about - -

11               THE COURT: Well, well.

12               MR. MEYER: Yeah.

13               THE COURT: If they get the 262 thousand. I don't

14   know what will happen if in fact the reverse stock split

15   occurs. I have a declaration from somebody who seems to

16   suggest it will reduce the value.

17               MR. MEYER: Yes you do. And you have the proxy that

18   says it may or may not.

19               THE COURT: Well, how is the Debtor harmed if I

20   require that the Debtor post a bond in the amount of the fair

21   market value of the stock as of today?

22               MR. MEYER: There's an expense to that.

23               THE COURT: What is the current share value?

24               MR. MEYER: $28, $29 I think. It's in that area, so

25   you're dealing with $6-8 million on a bond. If it was the

1    current value of the - -

2            THE COURT: Stock.

3            MR. MEYER: - - that number of shares.  Thank you.

4            THE COURT: As opposed to issuing the stock and

5    selling it.

6            MR. MEYER: I think issuing the stock and selling it

7    would be contrary to the plan.  But if you're talking about

8    our issuing it to them, pending a resolution of the appeal.

9            THE COURT: Well, issuing it and selling it, and

10   keeping it in escrow.  If you win the appeal - -

11           MR. MEYER: I have no idea what the effect of simply

12   putting into the - - I mean, I don't know that we could do it

13   as a matter of securities law, first.  If we were selling new

14   shares into the market place, I assume that that would need

15   to be done by registration, at least at the moment.  So I

16   think the cost of that would be substantial, and it would

17   also be a long time play.

18           THE COURT: Well, the alternative is to issue the

19   stock to the Pippin claimants - -

20           MR. MEYER: Which would be - -

21           THE COURT:  - - and require that they hold it in

22   escrow pending appeal.

23           MR. MEYER: I don't know that that deals with his

24   issue.  Then he's still in the same position he is now.

25   Whether we hold it or they hold it - -

1          THE COURT: Well, if he is given the right to sell

2     it, and keep the cash in escrow.

3          MR. MEYER: Well, if you give him the right to sell

4     it, then you have the same issue.  Then you have the same

5     problem.  That's not what the plan provides.  That's a

6     modification of the plan.

7          THE COURT: Well, if it's held in escrow.  Somehow

8     an escrow were achieved where he - - the Pippin claimants

9     don't get the benefit of it until an appeal is final.  Then

10    any action taken - -

11         MR. MEYER: Again, I think that - - I mean, what

12    you're talking about doing is a transaction that is

13    inconsistent with the plan.  And an issuance of shares is

14    going to involve all the trappings of SEC registration.  So I

15    mean, that's a difficulty in itself.  Now, the proxy

16    specifically provides that the same proportionate interest

17    will be protected, and so that they will have the same

18    proportionate interest.  Will any of these shareholders have

19    less than 20 shares?  I don't think so.  They'll all have

20    more than that.  You're not talking about somebody who's

21    going to be cashed out.  What you're going to be talking

22    about is somebody who has, if they prevail, will get shares

23    in the reorganized business representing the same proportion

24    as today, which they'll be able to sell in the same fashion

25    as today.

1    THE COURT: Well, not exactly.

2    MR. MEYER: In that respect, exactly.  Because it's

3    traded on the pink sheets now, and it will be then.

4    THE COURT: How many shares are there outstanding?

5    MR. MEYER: Well, let's see.  247 thousand

6    represented 13.4%, so that would - - so it would be 2 million

7    and something.  I don't know off the top of my head, Your

8    Honor.  I think it's probably in the proxy, but I don't have

9    that with me.  There are a million - - oh, I remember.

10   That's because there was another issuance there.  There's

11   1,613,270 shares of common outstanding, and 489,249 of

12   preferred.  That's subject - - that's a bracketed number.

13   I'm dealing with a preliminary proxy here, and there's

14   redemptions of that preferred that take place periodically.

15   THE COURT: Um-hum.  All right.  Thank you.

16   MR. MEYER: Thank you, Your Honor.

17   THE COURT: Well let me do this.  I am, I'm going to

18   have to deny the motion.  I do not have jurisdiction, even if

19   this were an adversary proceeding, to get involved in post-

20   confirmation corporate governance matters.  And I consider

21   the request for a stay of efforts to delist, or issue a - -

22   or proceed with a reverse stock split are corporate

23   governance matters over which I simply do not have

24   jurisdiction.  I've tried to consider whether there is any

25   relief I could accord to the Pippin claimants again, assuming

1    for purposes of this argument that their predictions of the

2    effect this would have on their rights, assuming those

3    predictions are correct, and I just don't see really what I

4    could do. I don't think, under the terms of the plan, I have

5    the authority to modify that plan at this late date. And I

6    think that under the terms of the plan, they are not entitled

7    to any issuance of stock until they have a final non-

8    appealable order. And that is clearly beyond my power to

9    deal with that. My order granting the Debtors' stay with the

10   condition was simply a condition that the Debtor escrow the

11   stock that would be necessary to be issued under the plan to

12   these claimants, if they are successful. And the Debtor has

13   assured that the stock is available to be issued if they are

14   successful, and that's all I required. I don't think that I

15   can, despite the suggestions and my questions, I don't think

16   I have the power to modify the plan to require to the Debtor

17   to either issue the stock early or to issue the stock into

18   escrow to permit it's monitization at this time or at any

19   time. I think the Pippin claimants are in the same boat as

20   any other disputed claimant who's claim has not been allowed

21   by final order of the Court. And quite frankly, they're just

22   stuck, I guess. It may be inequitable, but I don't think I

23   have jurisdiction or the ability, the power, to accord them

24   any other relief.

25          MR. KANE: Your Honor, if I may. Would you

1  reconsider the issue of a bond?  Clearly. . .(microphone not

2  recording).

3        THE COURT: But unfortunately, I don't think that

4  until you have a final order there's any money claim that you

5  have.  Or even any claim.  There is no harm that is

6  occasioned by - - well, the harm is occasioned by the terms

7  of the plan, not by the appeal, if you will.  So the status

8  quo is that until you have a final order allowing your claim,

9  you get nothing.

10       MR. KANE: Well, Your honor, actually we would take

11 the position that because of the fundamental changes to what

12 was the new Kaiser common stock, they're changing the nature

13 of it.  It's as if, when we asked for a bond to be imposed

14 before, we understood Your Honor to say, You don't have a

15 value there.  You don't have a right to a sum certain there.

16 What you have is essentially and apple.

17       THE COURT: Um-hum.

18       MR. KANE: And you have a right to so many apples.

19 And those apples may be rotten by the time you get them, but

20 you have apples.  Well, they're now changing the apples to

21 oranges.

22       THE COURT: Yeah, but under corporate law they have

23 the right to do that.  And they would have the right to do

24 that whether you were holding the apple or not.

25       MR. KANE: Your Honor, but they have to balance that

1    under their obligations here.  I mean, they can do that if

2    they want, but there has to be some consequence on this side

3    to make sure that these claimants are going to be treated the

4    same as all other claimants.

5         THE COURT: Well, they're saying you're going to get

6    the claims after the effect of the 20 for 1 reverse stock

7    split, just like everybody else.

8         MR. KANE: Well - -

9         THE COURT: And the fact that you don't have it now

10   so you can't sell it now is not - - is simply because of the

11   terms of the plan.  You don't get it until you have an

12   undisputed claim.

13        MR. KANE: Okay.  So -

14        THE COURT: So.  I wish I could - -

15        MR. KANE:  - - you don't believe a bond would be

16   appropriate, Your Honor?

17        THE COURT: I do not.

18        MR. KANE: Your Honor there were also the issues of

19   those 15,625 shares.  They're for the old common shares.

20   They're tied in with the claims.  And they're held hostage

21   and subject to this activity by the majority shareholders as

22   well.  It seems particularly inequitable to continue to hold

23   those under these sorts of circumstances, where, you know,

24   Mr. Meyer was saying some things.  They haven't put on any

25   evidence.  They haven't submitted any declarations.  We don't

1    have any of the corporate executives here to in any way

2    address the motivations behind their actions - -

3            THE COURT: I'm assuming - -

4            MR. KANE:  - - or the likely result.

5            THE COURT: I'm assuming they're doing it just to

6    deprive you of the value of your claims.

7            MR. KANE: Well, they're also doing it, Your Honor

8    - -

9            THE COURT: Even assuming that, I don't think I can

10   accord you any relief.

11           MR. KANE: I mean, it's quite likely that they're

12   doing it for their own personal benefit, because they're the

13   most likely to be the only market left for whatever is left

14   of these shares - -

15           THE COURT: That may be - -

16           MR. KANE:  - - by the time it gets through this

17   manipulative process that they're engaging in.  And it seems

18   particularly inequitable given that fundamental to 8005 is

19   sort of a balance between those things.

20           THE COURT: If you win, and if you get the stock

21   issued to you, I guess you have recourse to the State Courts

22   for some type of redress for their actions.

23           MR. KANE: Because we have no voice in State Court

24   now, because we don't have the shares.

25           THE COURT: I understand.  But I think that's the

1    terms of the plan.  The plan has been confirmed.  I don't

2    think I can change it.  Even if I wanted to.

3            MR. KANE: Thank you, Your Honor.

4            THE COURT: All right.  Debtor will get me - -

5    reorganized Debtor will get me a form of order.

6            MR. MINUTI: Your Honor, Mark Minuti.  We will do

7    so, Your Honor.  Thank you very much for your time today.

8            THE COURT: All right.  We'll stand adjourned.

9        (Whereupon at 2:54 p.m. the hearing in this matter was

10   concluded for this date.)

38

I, Jennifer Ryan Enslen, approved transcriber for the United States Courts, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Jennifer Ryan Enslen
18 Bar Drive
Newark, DE 19702
(302) 836-1905

6/3/05